PER CURIAM.
 

 Donald Bradley appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851. He also petitions this Court for a writ of habeas corpus.
 
 [1]
 
 For the reasons explained below, we affirm the circuit court’s order denying Bradley’s motion for postconviction relief, and we deny Bradley’s petition for writ of habeas corpus.
 

 OVERVIEW
 

 Bradley was convicted and sentenced to death for the 1995 first-degree murder-for-hire of Jack Jones. He was also convicted of burglary and conspiracy to commit murder. Bradley and two other men beat Mr. Jones to death in a feigned home-invasion scheme he planned with Mr. Jones’ wife, who was also convicted of murder. Brad
 
 *668
 
 ley’s trial took place in 1997, and the jury convicted him on all counts and recommended a sentence of death, which the trial court imposed. We affirmed Bradley’s convictions and sentence on direct appeal.
 
 See Bradley v. State,
 
 787 So.2d 732, 734 (Fla.2001). Bradley now appeals the denial of the postconviction motion he filed in the trial court, and he has also filed a petition for writ of habeas corpus in this Court.
 

 FACTS AND PROCEDURAL BACKGROUND
 

 Linda Jones (Mrs. Jones) became extremely upset when she learned that her husband, Jack Jones (Mr. Jones), was having an affair’ with a teenage girl whom the couple had befriended and taken into their home. Mrs. Jones made numerous attempts to break up the affair, but when they failed she asked Bradley to murder her husband in a feigned home-invasion scheme.
 
 [2]
 

 In accordance with the plan formulated by Mrs. Jones and Bradley, at about 8 p.m. on November 7, 1995, Bradley picked up two young men who worked for him and went to the Joneses’ residence to carry out an assault on Mr. Jones. The two young men, brothers Brian and Patrick McWhite, knew that they were going to assault Mr. Jones for $100 each “so he would quit seeing the girl.” Bradley, however, never told them of any plan to kill Mr. Jones. The two brothers had helped Bradley intimidate the girl earlier on Halloween night and had, at Bradley’s request, vandalized the girl’s car.
 

 Sometime shortly after 8 p.m., Bradley silently entered the house through a side door and took a gun Mrs. Jones told him was in the kitchen. Mr. and Mrs. Jones were watching television when the McWhite brothers entered unannounced through the front door. They were wearing ski-masks and gloves and carrying a “Zulu war stick” (a large wooden bat). As soon as Mr. Jones saw the intruders, he rose to his feet and ordered them to “get out.” He then ran toward them in an attempt to strike them. Mr. Jones was subdued and then beaten with the “war stick.” At some point during the beating, Bradley and the McWhite brothers duct-taped Mr. Jones, dragged him to another room and continued beating him. Bradley also duct-taped Mrs. Jones’ hands but cut the tape before leaving so that she could call the police. At one point, Bradley placed, the gun to Mr. Jones’ head and pulled the trigger, but the gun malfunctioned. Bradley then used the gun to strike Mr. Jones in the head numerous times. As a result of the beatings by Bradley and the McWhite brothers, Mr. Jones’ skull was fractured, his ribs were broken, and his brain and many internal organs were damaged. Before leaving, Bradley and the McWhite brothers removed some items from the house to make it appear that a burglary had taken place. After they left the house, Bradley told the brothers that he thought he had killed Mr. Jones. At 8:31 p.m., Mrs. Jones called 911 and reported a burglary. During the investigation, a neighbor reported seeing Bradley’s van leave the Jones home at the time of the alleged burglary, and the fingerprints of one of the brothers were found at the scene. Both brothers were arrested and confessed to their participation. They also told the police about the role Bradley had played. Bradley admitted that he made telephone calls to Mrs. Jones on the night of the murder but
 
 *669
 
 only with regard to picking up some tax documents from under Mrs. Jones’ front door. He said that he went to the Jones home, but left immediately when he did not find the documents.
 

 The McWhite brothers, Bradley, and Mrs. Jones were all charged with the murder. Mrs. Jones was tried and convicted of first-degree murder and sentenced to life imprisonment.
 
 [3]
 
 The brothers entered into a plea agreement in which they received ten-year sentences for third-degree murder. The plea agreement also required that they testify in the trials of both Mrs. Jones and Bradley.
 

 At Bradley’s trial, a friend of Mrs. Jones testified that a few days before the murder, Mrs. Jones told her that she wanted to take a gun and kill her husband and that she, not some other woman, was entitled to the proceeds of Mr. Jones’ life insurance policies worth some $500,000. Bradley told one of the McWhite brothers that he was expecting a payoff of between $100,000 and $200,000 after Mrs. Jones received the life insurance proceeds.
 

 During the guilt phase, Patrick McWhite testified that Mr. Jones repeatedly asked Bradley to stop beating him, but Bradley refused. Brian McWhite testified that he also asked Bradley to stop beating Mr. Jones. During the penalty phase, Patrick testified that Mr. Jones was alive throughout the beating. The trial judge informed the jury of the convictions and sentences of Mrs. Jones and the McWhite brothers. The jury was also told of Mrs. Jones’ convictions for two separate charges of soliciting others to kill her husband in similar home-invasion schemes, which were never carried out.
 

 In mitigation, the defense presented extensive evidence that Bradley came from a very dysfunctional family and that throughout their entire childhoods, he and his siblings were subjected to extreme emotional and physical abuse. Nonetheless, as an adult, Bradley developed a relationship with his father and helped his mother financially and otherwise. He also ran a successful landscaping business. Witnesses testified to Bradley’s intense commitment to his work and family.
 

 By a vote of ten to two, the jury recommended that Bradley be sentenced to death and the judge agreed.
 
 [4]
 
 We affirmed Bradley’s convictions and sentence of death on direct appeal.
 
 [5]
 

 See Bradley,
 
 787
 
 *670
 
 So.2d at 734. On November 14, 2002, Bradley filed an initial motion to vacate his judgment and sentence with special leave to amend. On September 22, 2003, Bradley filed an amended motion, raising eighteen claims.
 
 [6]
 
 On February 27, 2004, the
 
 *671
 
 postconviction court held a
 
 Huff
 
 hearing
 
 [7]
 
 and ordered an evidentiary hearing on claims 1, 2, 3, 4, and 18.
 
 [8]
 
 An evidentiary hearing was conducted on September 15, 2005, and then recessed while certain hairs were subjected to DNA testing. On June 21, 2007, after the DNA testing revealed no additional evidence, the circuit court rendered its order denying all claims. Bradley now appeals the denial of his post-conviction motion. He has also filed a petition for writ of habeas corpus, which is addressed in this opinion. We begin our discussion by examining the claims raised in Bradley’s 3.851 motion, the denial of which he has appealed here, followed by the claims he raised in the habeas petition.
 

 BRADLEY’S 3.851 CLAIMS
 

 The Issues on Appeal
 

 Bradley raised eighteen claims in his postconviction motion but seeks review of only four in this Court. First, Bradley contends trial counsel failed to fully investigate and utilize the duct tape evidence, resulting in a flawed decision as to the proper defense theory. Second, he asserts counsel’s act of withholding certain mental illness evidence from defense experts and the trial judge constituted ineffective assistance because disclosing such evidence could have allowed for a finding of extreme mental or emotional disturbance. Third, Bradley argues trial counsel was ineffective for failing to preserve for direct appeal the argument that he could not be found guilty of burglary because the victim’s wife invited him into the house; and that under this Court’s later decision in
 
 Delgado v. State,
 
 776 So.2d 233 (Fla.2000), the initial consent for entry could not be deemed revoked after he and the MeWhite brothers committed crimes against the victim. Fourth, Bradley contends the cumulative effect of counsel’s errors amounted to ineffective assistance of counsel.
 

 Ineffective Assistance of Counsel
 

 All four of Bradley’s claims allege that his attorney provided ineffective assistance of counsel during his trial. As we have explained before, the test when assessing the actions of trial counsel is not how, in hindsight, present counsel would have proceeded.
 
 See Cherry v. State,
 
 659 So.2d 1069, 1073 (Fla.1995). On the contrary, a claim for ineffective assistance of trial counsel must satisfy two criteria. First, counsel’s performance must be shown to be deficient.
 
 Strickland v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Deficient performance in this context means that counsel’s performance fell below the standard guaranteed by the Sixth Amendment.
 
 Id.
 
 When examining counsel’s performance, an objective standard of reasonableness applies,
 
 id.
 
 at 688, 104 S.Ct. 2052, and great deference is given to counsel’s performance.
 
 Id.
 
 at 689, 104 S.Ct. 2052. The defendant bears the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ”
 
 Id.
 
 (quoting
 
 Michel v. Louisiana,
 
 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). This Court has made clear that “[strategic decisions do not constitute ineffective assistance of counsel.”
 
 See Occhicone v. State,
 
 768 So.2d 1037, 1048 (Fla.2000). There is a strong presumption that trial counsel’s performance was not ineffective.
 
 *672
 

 See Strickland,
 
 466 U.S. at 669, 104 S.Ct. 2052.
 

 Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result.
 
 Strickland,
 
 466 U.S. at 689, 104 S.Ct. 2052. A defendant must do more than speculate that an error affected the outcome.
 
 Id.
 
 at 693, 104 S.Ct. 2052. Prejudice is met only if there is a reasonable probability that “but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Id.
 
 at 694, 104 S.Ct. 2052. Both deficient performance and prejudice must be shown.
 
 Id.
 
 Because both prongs of the
 
 Strickland
 
 test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo.
 
 See Sochor v. State,
 
 883 So.2d 766, 771-72 (Fla.2004). With that standard in mind, we turn first to Bradley’s claim that trial counsel was ineffective in regard to the duct tape evidence.
 

 I. The Duct Tape Evidence
 

 In Bradley’s first claim, he argues that trial counsel was ineffective by failing to fully examine the duct tape evidence and use it to properly formulate his defense theory. He asserts that the alibi defense chosen by counsel was flawed and that had trial counsel properly investigated the evidence, he would have realized that Mrs. Jones moved about the house and the garage before calling 911. During this time, Bradley argues, Mrs. Jones could have obtained a tire iron from her car in the garage and used it to “finish off’ her husband. Had trial counsel understood and properly used this knowledge, Bradley maintains, he would have chosen the independent act theory and contended that Mrs. Jones was the actual murderer because she struck the final blow. On this claim, the postconviction court ruled that there was evidence to support the alibi defense and that counsel made a reasonable tactical choice in utilizing that theory. Further, the court found that use of the alibi defense was approved by Bradley himself. The court also found that counsel
 
 did
 
 use the independent act theory as a backup defense and noted that an independent act instruction was included in the instructions given to the jury at the conclusion of the guilt phase.
 
 [9]
 

 At the postconviction evidentiary hearing, Bradley’s trial counsel, Alan Chip-perfield, testified that he had been an attorney since 1976, worked as a public defender for twenty-two years, and handled many capital cases before Bradley’s trial. He testified that Bradley’s case was his seventy-fifth death case and the fifteenth death case he had taken to the
 
 *673
 
 penalty phase. Trial counsel had organized and given many seminars on how to handle death cases and was still on the steering committee for planning each year’s seminar.
 

 When asked why he chose an alibi theory of defense over the independent act theory, trial counsel responded that since Bradley’s wife planned to testify that Bradley was at home with her at the time of the murder, and the police had no physical evidence linking Bradley to the murder, counsel concluded that an alibi defense was the better theory. Trial counsel also explained that it would have been very difficult to present a defense that Bradley had assaulted but not killed the victim and that the victim’s wife had done so, while at the same time arguing that he was not even at the house. Moreover, trial counsel explained that a palm print found at the scene did not match any of the defendants or the victim, which allowed the defense to focus on the possibility that an unknown person had committed the murder. Trial counsel also pointed out that the testimony of the McWhite brothers contained numerous contradictions, and he spent a good deal of time at trial arguing that the brothers were lying.
 

 The State had records for Bradley’s cell phone showing that numerous calls had been made to the Jones home around the time of the murder, which the State contended showed the final planning of the murder. Trial counsel testified that he felt it was significant that he was able to present Bradley’s sister, Cindy, to testify that she, and not Bradley, had used Bradley’s cell phone that night to make the calls to her friend Mrs. Jones around the time of the murder.
 

 In support of her husband’s alibi defense, Mrs. Bradley testified at trial that on November 7, 1995, her husband came home from work about 7 p.m., but left again at approximately 8 p.m. for about forty-five to fifty minutes to buy some snacks. According to Mrs. Bradley, her husband returned home with the snacks about 8:45 or 8:50 p.m. and they watched a movie from 9 p.m. to 11 p.m. Trial counsel also elicited testimony from Mrs. Bradley that Charles Shoup, a man for whom Bradley did landscaping work, called at about 8 p.m., as Bradley was leaving to go to buy the snacks. Mrs. Bradley testified that she answered the telephone and then handed it to her husband, who spoke with Shoup. According to Mrs. Bradley, the two did not talk long because Bradley told Shoup that he was just leaving and would call him back later. Trial counsel did not, however, rely solely on Mrs. Bradley’s testimony. Trial counsel also called Shoup to testify. Although Shoup called the Bradley home often, he did not specifically remember calling on November 7, 1995, or talking to Bradley. Shoup’s telephone records were submitted and showed a thirty-second call from Shoup’s telephone to the Bradley home at 7:54 p.m.
 

 At trial, the defense called an investigator to testify that the distance between the McWhite brothers’ residence and the Jones residence was twenty-two miles. The investigator testified that it would have been impossible for Bradley to have been home at 7:54 p.m. to talk to Shoup, then drive to the brothers’ residence to pick them up, drive to the Jones’ home, murder Mr. Jones, drop the brothers off, pick up snacks, and be back home by 8:45 or 8:50 p.m. to watch a movie. Due to the distance between the houses, trial counsel argued to the jury that forty-five minutes was not enough time for Bradley to have committed the murder.
 

 Evidence showed that all of the duct tape used in the assault was from the same roll. Tape from that same roll was found wadded up in the garage, and trial counsel
 
 *674
 
 argued to the jury that the wadded up tape was the tape used to bind Mrs. Jones’ hands and that she must have left it in the garage when she went there to retrieve the tool she used to strike her husband. He also commented on the fact that the shower was wet and argued that there would have been no reason for the shower to be wet unless Mrs. Jones had taken a shower to wash off the blood she had gotten on herself after beating her husband to death. Since there was evidence presented at trial that an L-shaped wound was found on the victim’s skull that was arguably inconsistent with being caused by the “Zulu war stick,” trial counsel employed his fall-back “independent act” theory during his final argument to argue that the L-shaped injury was incurred when Mrs. Jones struck Mr. Jones with the tire iron or some other metal object. Trial counsel also pointed out that spots found in the car in the garage, a teal Buick, tested positive for possible blood under a luminol test and asked the jury rhetorically, “What did Mrs. Jones go into the car for?” He argued that Mrs. Jones had the opportunity to get rid of the murder weapon before the police arrived by throwing it in the lake near her home and that, although it had been searched, the lake was large and the police could have missed it. Trial counsel further pointed out that according to the MeWhites’ testimony, the position that Mr. Jones was found in was different from that in which they left him. Moreover, during closing argument, trial counsel suggested that if the jury did not believe Bradley was at home with his wife, they should believe the McWhite brothers’ testimony that their intent was only to “rough up” the victim and that Bradley’s intent was the same. It is in the context of this trial scenario that we examine Bradley’s claim that trial counsel was ineffective for failing to investigate and use the duct tape evidence in his defense.
 

 Deficiency
 

 At the outset, we note that contrary to Bradley’s assertions, trial counsel did
 
 not
 
 fail to investigate the duct tape evidence and was
 
 not
 
 unaware that Mrs. Jones moved about the house before the police arrived. 'While counsel did not choose the “independent act” theory as his primary defense, he did make that argument as a “fail-back” defense. Thus, counsel cannot be deemed deficient for failing to investigate the duct tape evidence because competent, substantial evidence supports the trial court’s finding that trial counsel did investigate and utilize it at trial.
 

 Moreover, we conclude that counsel’s decision to pursue an alibi defense as the primary defense strategy was reasonable under the circumstances. Counsel considered using the independent act theory as his primaiy defense, but decided the alibi defense was more promising because there was evidence to substantiate it. Only mere speculation supported the theory that Mrs. Jones killed Mr. Jones by striking him with a tool from the garage. There was no evidence that a tire iron was actually kept in Mrs. Jones’ car — nor was a tire iron ever found. A fire poker was kept in the living room but there was no evidence presented that it had blood on it. Further, no blood was found on Mrs. Jones or any of her clothing.
 

 Despite postconviction counsel’s assertion that the stain found in the teal Buick should have been tested to prove it was a blood stain left there when Mrs. Jones entered the vehicle to obtain the tire iron, postconviction counsel made no attempt to test the stain either. The luminol test’s positive result for the stain in the car was not definitive evidence that the substance was indeed blood or, if it was blood, that it
 
 *675
 
 was Mr. Jones’ blood.
 
 [10]
 
 The fact that the stain remained uncollected and untested benefited Bradley at trial because trial counsel could then suggest to the jury that it was Mr. Jones’ blood. Thus, it is clear that trial counsel made a reasonable strategic decision to utilize an alibi defense as the main defense in Bradley’s case.
 
 See Occhicone,
 
 768 So.2d at 1048 (“[Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”). Accordingly, we conclude that trial counsel was not deficient for choosing to focus on the alibi defense rather than the independent act defense.
 

 Prejudice
 

 Even if trial counsel’s actions could be considered deficient, we conclude that Bradley has not met the prejudice prong of
 
 Strickland.
 
 To meet this prong, the claimant must “establish prejudice [and] ‘must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ ”
 
 Williams v. Taylor,
 
 529 U.S. 862, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting
 
 Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052). As set forth below, we conclude that the second prong has not been met.
 

 At the evidentiary hearing on Bradley’s postconviction motion, he failed to provide a legal basis to support the claim that pursuing an “independent act” theory as his primary defense at trial would have exonerated him from his role in beating Mr. Jones to death. Further, Bradley has failed to show that by using the independent act doctrine exclusively, there is a reasonable probability that it would have changed the result of his trial. Indeed, the independent act doctrine only arises “when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofel-on, “which fall outside of, and are foreign to, the common design of the original collaboration.’ ”
 
 Willacy v. State,
 
 967 So.2d 131, 141 (Fla.2007) (quoting
 
 Ray v. State,
 
 755 So.2d 604, 609 (Fla.2000)). Such a defense cannot apply when death was a foreseeable result of the plan.
 
 See Archer v. State,
 
 613 So.2d 446, 448 (Fla.1993) (holding that the independent act theory is inappropriate when the defendant created the situation and the victim’s death was a natural and foreseeable result of forces which the defendant set in motion).
 

 In Bradley’s case, even if the intended underlying criminal enterprise was merely to “beat some sense” into Mr. Jones, the beating would clearly be considered a foreseeable force which set in motion the killing. Further, Bradley knew before he entered the house that he would obtain a firearm there and use it in the crime, which could foreseeably result in death.
 
 See Roberts v. State,
 
 4 So.3d 1261, 1264 (Fla. 5th DCA) (explaining that the independent act theory is inappropriate when the defendant “knew that firearms or deadly weapons would be used”),
 
 review dismissed,
 
 14 So.3d 1004 (2009). Moreover, Bradley’s jury was given the independent act instruction and rejected the theory. While Bradley appears to argue that if trial counsel had focused
 
 exclusively
 
 on the independent act theory and never raised an alibi defense, Bradley might
 
 *676
 
 have fared better, this is mere speculation. The testimony of the McWhite brothers as well as that of the medical examiner depicts a brutal and methodical beating, resulting in profuse bleeding from the victim’s head, broken ribs, a fractured skull, and bruising of the victim’s brain and internal organs. In the middle of the beating, the assailants dragged Mr. Jones to another location in the house and continued to beat him. Finally, Bradley planned to use a gun in the attack and in fact tried to shoot Mr. Jones by placing the gun to his head and attempting to fire it. All this evidence contradicts any contention that Bradley’s only intent was to “teach Mr. Jones a lesson.” Even without the evidence that Bradley expected a payoff, the methodical, brutal, and continuous nature of the beating evidences a clear intent to kill Mr. Jones.
 
 See, e.g., Taylor v. State,
 
 583 So.2d 323, 329 (Fla.1991) (finding premeditation where defendant dragged the victim and so severely beat her that ribs were broken and all internal organs and brain were bruised). As we explained in our decision on direct appeal, there was extensive evidence presented at trial showing Bradley intended to kill Mr. Jones.
 
 [11]
 
 Thus, regardless of whether trial counsel had relied on the independent act theory as his primary defense or only as a backup defense, evidence refuting the notion that Bradley’s intent was only to beat and not kill Mr. Jones was substantial and compelling. We conclude that even if trial counsel was deficient, Bradley has failed to show, pursuant to the second prong of
 
 Strickland,
 
 that trial counsel’s allegedly deficient performance prejudiced him. Thus, Bradley’s first claim is without merit.
 

 II. Mental Mitigation
 

 In Bradley’s second claim he contends that trial counsel was ineffective in preparing for the penalty phase because he withheld from his defense experts one page of Bradley’s mental health records, which indicated Bradley had an increased risk of violent behavior without medication.
 
 [12]
 
 Bradley claims that withholding the page precluded the defense experts from properly evaluating him and prevented them from developing sufficient mitigation to allow for a finding of the statutory mitigator of extreme mental or emotional disturbance. He also criticizes trial counsel for deciding not to present the testimony of his defense experts at trial. At oral argument, postconviction counsel argued that even if trial counsel reasonably kept the record from his experts to preclude their use by the prosecution, trial counsel should have changed his strategy after the jury’s death recommendation and should have presented
 
 all
 
 mental health information to the judge at the Spencer
 
 [13]
 
 hearing. Bradley also argues that trial counsel’s strategy for presentation of mitigation evidence was deficient. As explained below, we disagree with each of these contentions.
 

 The postconviction court found that trial counsel conducted an extensive penalty phase and mitigation investigation. The court also concluded that counsel ade
 
 *677
 
 quately explained why he chose not to present all the mental health information in mitigation. At the evidentiary hearing, Bradley’s trial counsel testified that in preparation for the penalty phase, he obtained and reviewed records outlining Bradley’s social and medical history. Among those records were Bradley’s drug treatment records from CARE, his criminal history, medical records, divorce records, child support records, and some records from the Department of Children and Families. Trial counsel testified that Bradley’s CARE records from 1987 (eight years before the murder) indicated that he had suffered from cocaine and marijuana dependency, depression, and a moderately severe mental disorder for a long period of time. The records also indicated that “when patient is not self-medicating, he experiences high anxiety, high anger, possible bipolar symptoms, increased violence and risk of violent behavior without his RX medications.” Another note indicated that Bradley was experiencing mood swings and had experienced long-term problems with anger and rage.
 

 Trial counsel hired Dr. Harry Krop, a psychologist, and Dr. Roger Szuch, a family counselor and expert in dysfunctional families, to assist him in preparation of possible mental health mitigation. Counsel supplied Dr. Krop and Dr. Szuch with numerous pages of psychiatric records, including most of Bradley’s CARE records. He also supplied his experts with records of his interviews with family members, a case summary, the McWhite brothers’ statements, a copy of certain medical records concerning Bradley’s treatment for an anxiety disorder, and a copy of Bradley’s criminal history. Trial counsel asked Dr. Krop to conduct neuropsychological testing and also obtained and forwarded to Dr. Krop records concerning a 1977 auto accident.
 
 [14]
 
 Bradley told Dr. Krop that he did not have a drinking problem, was taking prescription Xanax, was not using any illegal drugs the night of the murder, and had been drug-free during the five years before the murder.
 

 Trial counsel explained that he did not focus on Bradley’s drug abuse problems at trial because they did not fit in with his strategic decision to present Bradley as a productive member of society. He testified:
 

 I wanted the jury to think that this [murder] was an aberration in behavior for Donald Bradley and that he was otherwise a productive, hard working member of society and drugs go against that. You can — you can put both in but I didn’t think it would serve us best to put psychological testimony on because it kind of conflicts with what I was trying to show to the jury, that this was an aberration in his behavior and he’s normally not like that.
 

 Trial counsel further explained:
 

 I think probably Clay County is more conservative even than Duval County and ... I think I knew back then that, you know, they don’t like drugs, they don’t like excuses, they like the death penalty.
 

 Trial counsel presented testimony from Bradley’s wife that he had overcome his drug problems. Further, counsel intentionally withheld from his defense experts one page of the CARE records because it discussed Bradley’s increased anxiety, possible bipolar symptoms, and increased risk of violence without prescription medications. Counsel testified that he often
 
 *678
 
 excluded portions of the records he sent his experts, explaining:
 

 [Y]ou don’t want to mislead your expert. You have to keep credible with the expert and you have to be honest with him so he can reach an honest opinion, but at the same time you have to be aware that he is going to be subject to cross-examination about every piece of paper he gets because that can be turned over to the other side. When there are things in the paper that could be good cross or could provide good fuel for cross, you have to decide whether to send it to the expert or not. If it’s likely the other side has it anyway, then you send it because they’re going to be able to cross if they have it and he doesn’t have it, then they can cross on it and ... then not only have they put in the bad stuff, but they have discredited your witness and in a roundabout way discredited you because you didn’t send it to your witness.
 

 Although trial counsel decided not to give his experts the records that showed Bradley had anger problems and was prone to violence when not on his medications, trial counsel testified that during Dr. Krop’s clinical interview, Bradley told the doctor about his anxiety, rage, and panic attacks. Bradley said he would “rage until I forget what I’m doing and I reach peaks of great madness.” Trial counsel did not present this information at trial because he was concerned- that it might remind the jury of Brian McWhite’s testimony that he unsuccessfully tried to get Bradley to stop beating Mr. Jones. Trial counsel did not believe information about Bradley’s anger and rage when not medicated would be well-received by the jury.
 

 When asked why he did not present the mental health experts to testify during the penalty phase, trial counsel explained that he did not ask his experts to testify because they had information that he wished to keep from the jury. The experts had records showing that Bradley had been in prison, had been delinquent in paying child support, and was involved in incidents of domestic abuse both with a prior girlfriend and with his former wife. Another record possessed by the experts indicated that Bradley had severely beaten his ex-wife while she was pregnant and that he had abused a former girlfriend’s children. Additional records showed that Bradley had been charged with aggravated assault against either a girlfriend or his former wife.
 
 [15]
 
 Presenting his experts in the penalty phase could have resulted in this information being revealed to the jury, and trial counsel did not believe any of it would benefit Bradley.
 

 Trial counsel decided that, instead of presenting potential mitigation through expert testimony, it would be better to present it through the testimony of Bradley’s family. Thus, counsel presented several members of Bradley’s family who testified that Bradley had endured an abusive childhood and dysfunctional early home life and had suffered anxiety attacks. They also testified that he had drug problems in the past. However, since the strategy was to show that Bradley had overcome these difficulties and had gone on to become a productive member of society, his family members also testified that Bradley’s difficult childhood and drug-abuse problems were behind him.
 

 Deficiency
 

 We conclude that trial counsel’s decision not to provide his experts with one page of
 
 *679
 
 mental health records suggesting that Bradley might be prone to -violence without his medications, as well as counsel’s ultimate decision not to call the mental health experts to testify during the penalty phase, were strategic choices based on an informed and reasoned plan of action. Trial counsel painstakingly investigated potential mitigation, including mental mitigation material. He strategically determined that presenting all the drug and mental information to the jury would not be beneficial, would open the door to the prosecution’s cross-examination concerning it, and would conflict with his theory that Bradley was generally a hard-working, productive member of society who had simply deviated from his generally good character. These informed choices were reasonable strategic decisions.
 
 See Card v. State,
 
 992 So.2d 810, 816 (Fla.2008) (concluding that counsel reasonably utilized lay testimony to attempt to humanize the defendant);
 
 Miller v. State,
 
 926 So.2d 1243, 1252 (Fla.2006) (determining that defense counsel reasonably chose not to present certain mental health records via testimony of a psychologist and instead presented the information through sympathetic testimony of defendant’s family members);
 
 Gaskin v. State,
 
 822 So.2d 1243, 1248 (Fla.2002) (“Trial counsel will not be held to be deficient when she makes a reasonable strategic decision to not present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony.”);
 
 Rutherford v. State,
 
 727 So.2d 216, 222-23 (Fla.1998) (concluding that counsel reasonably made the decision to focus on defendant’s “solid, ‘Boy Scout’ character traits,” humanize him, and advance the theory that he was a “ ‘good ol’ fellow’ who must have just lost it”) (quoting trial court’s order);
 
 Haliburton v. Singletary,
 
 691 So.2d 466, 471 (Fla.1997) (determining that trial counsel’s penalty phase strategy to humanize the defendant and not call any mental health experts was not ineffective assistance of counsel).
 

 Moreover, we note, as did the postcon-viction court, that Bradley asserted in his postconviction motion that he would present his own mental health experts at the evidentiary hearing to testify that the excluded mental health information would have provided a basis for finding the extreme mental or emotional disturbance mitigator. Nonetheless, he presented no experts at the hearing. Accordingly, for all the foregoing reasons, we conclude that Bradley has not demonstrated that trial counsel was deficient in deciding to withhold one page of the CARE records from his experts and in deciding not to present the experts to testify in the penalty phase.
 

 We also reject Bradley’s assertion that trial counsel had an obligation to change his strategy at the
 
 Spencer
 
 hearing. Counsel was not deficient in making an informed, reasoned, strategic decision to maintain his general mitigation strategy at the
 
 Spencer
 
 hearing. We cannot agree that after the jury recommended death, there was “nothing left to lose” and that trial counsel had an absolute duty to use all the mental health evidence at his disposal.
 
 [16]
 
 The excluded evidence would
 
 *680
 
 have portrayed Bradley as violent and abusive, contrary to the mitigation presented to the jury. Thus, under the facts of this case, trial counsel had no duty to change his strategy of presenting Bradley as a man who had overcome his tragic past to one depicting him as a deeply scarred, drug-addicted, mentally ill man with a history of rage and panic attacks.
 

 Although the strategy chosen by trial counsel and Bradley did not prevail, that fact alone does not render the strategy unreasonable or deficient. Were that the test, all defendants sentenced to death would have claims for ineffective assistance of trial counsel.
 
 See Heath v. State,
 
 3 So.3d 1017, 1029 (Fla.2009) (“The fact that this defense strategy was ultimately unsuccessful with the jury does not render counsel’s performance deficient.”);
 
 see also Henry v. State,
 
 948 So.2d 609, 616 (Fla.2006) (“It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence ....”) (quoting
 
 Strickland,
 
 466 U.S. at 689, 104 S.Ct. 2052). Accordingly, Bradley has failed to demonstrate that his trial counsel was deficient in his investigation or presentation of mental health mitigation. Thus, the first prong of
 
 Strickland
 
 has not been established.
 

 Prejudice
 

 Even if trial counsel’s actions could be considered deficient, we conclude Bradley has not met the prejudice prong of
 
 Strickland.
 
 As we explained earlier, to meet this prong, the claimant must “establish prejudice [and] ‘must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ ”
 
 Williams,
 
 529 U.S. at 391, 120 S.Ct. 1495 (quoting
 
 Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052).
 

 Even if Bradley’s trial counsel was deficient in failing to present the additional mental health information, there is no reasonable probability that presenting Bradley as a man with “mental infirmities” (as postconviction counsel asserts should have been done) would have resulted in a lesser sentence. The trial court sentenced Bradley to death upon a finding of four aggravating factors, including two of the weightiest aggravators — that the capital felony was especially heinous, atrocious or cruel (HAC), and that the murder was committed in a cold, calculated and premeditated manner (CCP).
 
 See Morton v. State,
 
 995 So.2d 233, 243 (Fla.2008) (“This Court has previously stated that CCP and HAC are two of the weightiest aggravators in Florida’s statutory sentencing scheme.”). Thus, we conclude that even if this additional mental mitigation had been presented, in light of the considerable aggravation, there is no reasonable probability that the outcome would have been different.
 
 See Breedlove v. State,
 
 692 So.2d 874, 878 (Fla.1997) (finding no prejudice because the case’s strong aggravating factors would have overwhelmed the mitigation evidence of the defendant’s history of drug addiction and his troubled childhood);
 
 Tompkins v. Dugger,
 
 549 So.2d 1370, 1373 (Fla.1989) (same). Bradley has provided nothing to undermine our confidence in the death sentence imposed in his case. Accordingly, Bradley has failed to show that the prejudice prong has been satisfied. Bradley’s claim that trial counsel was ineffective in his mental health mitigation
 
 *681
 
 preparation and presentation is without merit.
 

 III. Failure to Challenge the Legal Sufficiency of the Burglary Charge
 

 In Bradley’s third claim, he asserts that trial counsel was ineffective for failing to challenge the legal basis for the burglary charge in the trial court in order to preserve that issue for appellate review. He claims that trial counsel failed to preserve a “cognizable issue based on available evidence” challenging the legal sufficiency of the burglary charge, similar to the issue preserved and decided in
 
 Delgado v. State,
 
 776 So.2d 233 (Fla.2000). Bradley argues that this failure to preserve the issue made it impossible for him to challenge and correct that error on direct appeal to this Court. By this argument, he suggests that on direct appeal, this Court would have found no burglary conviction, and thus no felony murder, possible based on the holding in
 
 Delgado,
 
 which was issued prior to the conclusion of Bradley’s appeal in 2001.
 

 Bradley’s crimes were committed in 1995 and he was tried in 1997. At that time, it was settled law that a defendant could be convicted of burglary if the defendant was an invited guest who, after gaining consensual entry into the victim’s residence, began committing criminal acts against the host, because the law presumed the initial consent to enter had been revoked by those criminal acts.
 
 [17]
 
 In 2000, this Court receded from previous opinions holding that crimes committed against the host after an initial consensual entry resulted in an implied revocation of the initial consent to enter. Instead, this Court held in
 
 Delgado
 
 that in order to prove burglary after an initial consensual entry, the evidence must show that the defendant remained in the structure surreptitiously.
 
 See Delgado,
 
 776 So.2d at 240-41. Shortly after the decision in
 
 Delgado,
 
 the Florida Legislature enacted legislation abrogating that decision, and clarifying that “for a burglary to occur, it is not necessary for the licensed or invited person to remain in the dwelling, structure or conveyance surreptitiously.”
 
 [18]
 
 Nevertheless, the window for those affected by
 
 Delgado
 
 was defined by this Court in
 
 Lynch v. State,
 
 2 So.3d 47, 61 (Fla.2008), as applying to “burglaries committed before February 1, 2000, which had not been finally adjudicated at the time this Court issued its opinion in that case (i.e., August 24, 2000).” Bradley’s case fits within that time frame. Even so, as explained below, we find no merit to this claim. Bradley cannot show deficiency for the same reasons that he cannot show prejudice. Therefore, we combine our discussion of Bradley’s arguments into one discussion of both prongs of
 
 Strickland.
 

 Deficiency and Prejudice
 

 Bradley contends that trial counsel should have challenged the legal sufficiency of the burglary charge at trial, thereby preserving that issue for appeal.
 
 *682
 
 His argument has two component parts. First, Bradley asserts that trial counsel should have challenged the burglary charge at trial on the grounds that, because Mrs. Jones was a coinhabitant and co-owner, she had the authority to consent to the initial entry of the coconspirators, and consent is a defense to burglary. Second, Bradley argues that had counsel preserved a challenge to the burglary charge, Bradley would not have been barred from raising a
 
 Delgado
 
 claim on direct appeal in this Court, and he would likely have been able to eliminate his burglary/felony-murder conviction on appeal under the law announced in
 
 Delgado.
 

 [19]
 

 We address these arguments in turn.
 

 First, we note that had trial counsel challenged the burglary charge on the grounds that because Mrs. Jones was a eoinhabitant she had the authority to consent to the initial entry of the coconspira-tors, the trial court would likely have rejected that contention because it was then and still is contrary to established case law. Long before Bradley’s trial, we held that a coconspirator who shares the residence with the victim cannot provide consent to enter on behalf of the victim for the purposes of committing a crime against the victim.
 
 See, e.g. Fotopoulos v. State,
 
 608 So.2d 784 (Fla.1992) (holding that Fo-topoulos had no moral or legal authority to give his hired murderer consent to enter Fotopoulos’s wife’s residence even though Fotopoulos also lived there);
 
 Damico v. State,
 
 153 Fla. 850, 16 So.2d 43 (1944) (holding that the corporate officer who had left the corporate safe open for Damico had no legal or moral right to consent to Damico’s entry, nor could he consent to the crime on behalf of the corporation);
 
 see also K.P.M. v. State,
 
 446 So.2d 723 (Fla. 2d DCA 1984) (holding that the son’s purported consent to enter the residence to steal the father’s valuables was “unauthorized and inoperative” even though the son lived with the father). Under this existing case law relating to consent, Bradley’s claim that he had valid initial consent from Mrs. Jones to enter the residence is without merit. Thus, trial counsel cannot be deemed deficient for failing to raise a nonmeritorious legal theory.
 
 Thompson v. State,
 
 759 So.2d 650, 665 (Fla.2000) (stating that counsel cannot be deemed ineffective for failing to raise meritless issues).
 

 Further, to the extent Bradley’s argument can be understood as contending that trial counsel should have predicted the merits of
 
 Delgado
 
 and should have preserved a similar issue for appeal, that argument fails as well. Trial counsel could hardly be expected to predict this Court’s decision to recede from the long-standing body of prior case law holding that crimes committed against the host after an initial consensual entry resulted in an implied revocation of the consent to enter. As we held in
 
 Muhammad v. State,
 
 426 So.2d 533, 538 (Fla.1982), counsel cannot be deemed ineffective for failing to predict a later Supreme Court decision.
 
 Id.
 
 at 538 (concluding that postconviction counsel’s assertion that trial counsel was ineffective was without merit because it presupposed that counsel should have predicted a later United States Supreme Court decision).
 

 Next, addressing the second argument, even if trial counsel had challenged the legal sufficiency of the burglary charge at
 
 *683
 
 trial and preserved that claim for appeal, Bradley’s
 
 Delgada
 
 argument would not have prevailed because Bradley’s case is distinguishable on the facts. In
 
 Delgado,
 
 it was uncontested that the husband and wife invited Delgado into their house, and the significant issue was whether that initial consent was considered withdrawn by Delgado’s subsequent crimes, in order to prove a burglary under the statute. The Court stated:
 

 The issue for this court to consider is whether the phrase ‘remaining in’ found in Florida’s burglary statute should be limited to situations where the suspect enters lawfully and subsequently secretes himself or herself from the host. Up until now, Florida courts have refused to make such a limiting interpretation.
 

 Id.
 
 at 238. We resolved the issue by holding that the statute required that where a defendant had initial consent to enter, he or she had to remain surreptitiously in order for a burglary to be proven. This holding departed from prior precedent that held initial consent was impliedly revoked by subsequent criminal acts of the guest.
 

 Because in the instant case, under
 
 Foto-poulos
 
 and the other cited cases, Bradley and the McWhites never had initial consent to enter, the holding in
 
 Delgada
 
 would have provided no relief to Bradley on appeal.
 
 [20]
 
 Moreover, even if it could be said that Mrs. Jones invited the assailants into the house, once Mr. Jones saw them enter his home, he immediately rose from his chair and ordered the intruders to “get out.” Thus, any consent was
 
 expressly
 
 revoked prior to the assailants’ opportunity to begin their attack on Mr. Jones. We never intended our decision in
 
 Delgado
 
 to imply that a coinhabitant or co-owner could irrevocably consent to entry by his or her coconspirators for the purpose of subjecting the other inhabitant or owner to a crime.
 

 Finally, even if Bradley had been able to defeat the burglary charge and the resultant felony-murder conviction, either in the trial court or on appeal, the first-degree premeditated murder conviction would still have remained. In this case, the State argued that both felony-murder and premeditated murder theories were applicable to the crime, and the jury delivered a general verdict. We have held that a “general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation.”
 
 Crain v. State,
 
 894 So.2d 59, 73 (Fla.2004). In the direct appeal decision in this case, we stated that “[ujpon review of the record, and taking the inferences most favorable
 
 *684
 
 to the State, we conclude that the evidence was sufficient to support a finding of premeditation by Bradley.”
 
 Bradley,
 
 787 So.2d at 738.
 

 Thus, for the reasons set forth above, we conclude that counsel’s performance was not deficient, and even if it were, there is no reasonable probability that had counsel acted otherwise the result of the proceeding would have been different. Since our confidence in the outcome has not been undermined, no prejudice has been shown. Because neither the deficiency nor the prejudice prong of
 
 Strickland
 
 has been established, we conclude Bradley’s claim that trial counsel was ineffective by failing to challenge the burglary charge in order to preserve the issue for appeal is without merit.
 

 IV. Cumulative Error Claim
 

 In Bradley’s fourth claim, he contends that trial counsel committed numerous errors amounting to ineffective assistance of counsel and to the extent that any one error might not warrant relief standing alone, the combined effect of the errors justifies relief. We disagree. Where, as here, the alleged errors urged for consideration in a cumulative error analysis “are either meritless, procedurally barred, or do not meet the
 
 Strickland
 
 standard for ineffective assistance of counsel[,] ... the contention of cumulative error is similarly without merit.”
 
 Israel v. State,
 
 985 So.2d 510, 520 (Fla.2008);
 
 see also Lowe v. State,
 
 2 So.3d 21, 33 (Fla.2008) (holding that where individual claims are either procedurally barred or without merit, the cumulative error claim must fail);
 
 Parker v. State,
 
 904 So.2d 370, 380 (FLa.2005) (same). Bradley has failed to provide this Court with any basis for relief in any of his postconviction claims. Therefore, the cumulative error claim is without merit.
 

 BRADLEY’S HABEAS CLAIMS
 

 In Bradley’s petition for habe-as corpus he alleges appellate counsel was ineffective during the direct appeal to this Court. Claims of ineffective assistance of appellate counsel are appropriately raised in a petition for writ of habeas corpus.
 
 See Freeman v. State,
 
 761 So.2d 1055, 1069 (Fla.2000). In order to grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must determine the following:
 

 [W]hether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
 

 Pope v. Wainwri.ght,
 
 496 So.2d 798,
 
 800
 
 (Fla.1986). “The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.”
 
 Freeman,
 
 761 So.2d at 1069. With this standard in mind, we turn to Bradley’s first claim of ineffective assistance of appellate counsel.
 

 Failure to Appeal the Trial Court’s Denial of Bradley’s Motions Attacking the Constitutionality of Florida’s Capital Sentencing Scheme
 

 In Bradley’s first habeas claim, he contends that appellate counsel was ineffective for failing to appeal the denial of his many commonly filed “boiler-plate” motions challenging the constitutionality of Florida’s death penalty statutes.
 
 [21]
 
 None
 
 *685
 
 theless, Bradley has failed to set forth any basis upon which this Court could grant him relief. Instead, he simply refers the Court to his claims filed below. As we have previously held, vague and conclusory allegations are insufficient to warrant relief.
 
 See Doorbal v. State,
 
 983 So.2d 464, 482 (Fla.2008) (“[T]o merely refer to arguments presented during the postconviction proceedings without further elucidation is not sufficient ... and these claims are deemed to have been waived.”);
 
 Thompson v. State,
 
 759 So.2d 650, 668 (Fla.2000) (denying habeas claim, in part, as legally insufficient because defendant made only a conclusory statement without specific supporting facts). The purpose of a legal brief is to offer argument in support of the issues raised on appeal.
 
 See Doorbal,
 
 983 So.2d at 482. Bradley has failed to do this, and consequently, he has failed to meet his burden of demonstrating that appellate counsel was ineffective.
 
 See Parker v. State,
 
 904 So.2d 370, 375 n. 3 (Fla. 2005) (declining to review four issues that Parker raised on appeal because the claims of error were “bare-bones” and con-clusory). Accordingly, Bradley has failed to present a legally sufficient claim for habeas relief and this claim is denied as waived.
 

 Failure of Appellate Counsel to Appeal the Denial of Bradley’s Motions to Suppress his Cell Phone Records and his Statements to Law Enforcement
 

 Bradley also claims his appellate counsel was ineffective for failing to challenge the denial of two motions to suppress. He asserts that his cell phone records and certain unspecified statements made at his house on January 22, 1996, were illegally obtained. Trial counsel moved to suppress the items, but the motions were denied and appellate counsel did not raise them on appeal. However, Bradley does not set forth any grounds to support his allegation that these records were illegally obtained. He further fails to identify the records, other than referring to them as the “flip-phone records.” Bradley also fails to identify the statements that he contends should have been challenged on appeal. Finally, other than making a general assertion that admission of the unspecified statements violated his Fourth, Fifth, and Fourteenth Amendment rights, Bradley fails to set forth any argument explaining why these records were allegedly “illegally obtained” or how their admission violated his rights.
 

 Accordingly, we conclude that Bradley has again failed to provide any basis upon which this Court might grant him habeas relief. As with his first habeas claim, because his presentation of the issues is legally insufficient, this claim is also denied as waived. Accordingly, we deny the petition for writ of habeas corpus.
 

 CONCLUSION
 

 For the reasons stated above, we affirm the trial court’s denial of postconviction relief. We also deny Bradley’s petition for writ of habeas corpus.
 

 It is so ordered.
 

 
 *686
 
 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), (9), Fla. Const.
 

 [2]
 

 . Mrs. Jones knew Bradley because she prepared his tax returns and was also a friend of his sister, Cindy Bradley.
 

 [3]
 

 . In Mrs. Jones’ separate trial, the jury was instructed on the statutory mitigating factor of extreme emotional disturbance due to the fact that Mrs. Jones’ husband was having an affair with a nineteen-year-old after many years of marriage and Mr. Jones "flaunted” the fact that he had a younger lover.
 

 [4]
 

 . The trial court found four aggravating circumstances: (1) the capital felony was especially heinous, atrocious or cruel (HAC); (2) the murder was committed in a cold, calculated and premeditated manner (CCP); (3) the capital felony was committed for pecuniary gain; and (4) the capital felony was committed while engaged in the commission of the crime of burglary. The trial court found two statutory mitigating circumstances, but gave very little weight to both: (1) the defendant had no significant history of prior criminal activity and (2) the age of the defendant at the time of the crime. The trial court also found and gave "some weight” to certain nonstatu-tory mitigating circumstances: (1) Bradley overcame a chaotic childhood and dysfunctional family life to make real achievements in his own life, including establishing loving relationships in his family and reestablishing a relationship with his father; (2) he had been a good provider and father for his present wife and his children; (3) he loved his family and was loved by them; (4) he maintained a good employment record; (5) he was helpful to other people inside and outside his family; and (6) he showed sincere religious faith.
 

 [5]
 

 .On direct appeal, Bradley raised eight claims of error: (1) the evidence was insufficient to support Bradley's conviction for premeditated first-degree murder because there
 
 *670
 
 was conflicting evidence regarding his intent to kill; (2) the evidence was insufficient to support his conviction for felony-murder (based on the burglary) because Mrs. Jones consented to his entry into the home; (3) even assuming the finding of premeditation, he was entitled to a new trial because the jury may have convicted him on a legally insufficient theory (felony-murder with burglary as the felony); (4) the evidence was insufficient to prove conspiracy to commit first-degree murder; (5) the trial court erred in admitting evidence that Bradley vandalized the teenage girlfriend's car prior to the murder; (6) the trial court erred in admitting an out-of-court statement by a detective to the effect that Bradley's van had been detailed five times since the murder; (7) the trial court erred in instructing the jury on and in finding the CCP aggravator; and (8) the sentence was disproportionate and the trial court erred in instructing the jury on and in finding the burglary aggravator.
 

 [6]
 

 . The eighteen claims raised in the postcon-viction motion were as follows: (1) trial counsel rendered ineffective assistance when he failed to properly preserve the issue that the burglary charge was legally invalid under
 
 Delgado v. State,
 
 776 So.2d 233 (Fla.2000), because Mrs. Jones invited the "burglars” into the house; (2) trial counsel was ineffective because he failed to discover the State's nondisclosure of certain exculpatory evidence under
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), false testimony under
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), as well as newly discovered evidence; (3) trial counsel was ineffective for failing to fully investigate, prepare and present mitigation; (4) Bradley was denied his right to an evaluation by a competent mental health expert pursuant to
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (5) trial counsel was ineffective for failing to object to improper arguments by the prosecutor during the penalty phase, to request curative instructions, and to argue the correct law in his closing argument; (6) the standard juiy instructions given during the penalty phase improperly shifted the burden of proof to the defendant to establish that the mitigating factors outweighed any aggravating factors proven by the State; (7) trial counsel was ineffective by failing to object and request a curative instruction when the prosecutor urged the jury to consider an invalid aggravating factor (being killed in one’s own home); (8) the sentencing jury was misled by comments, questions, and instructions by the prosecutor and the trial court that unconstitutionally and inaccurately diluted the jury’s sense of responsibility as to their recommendation, in violation of
 
 Caldwell v. Mississippi,
 
 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and trial counsel was ineffective for failing to object to and ask for a curative instruction; (9) Florida Rule of Professional Conduct 4-3.5(d)(4), which precludes counsel from conducting interviews with the jurors, is unconstitutional because it denies the defendant access to court and violates his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; (10) Bradley’s federal and state constitutional rights against cruel and unusual punishment will be violated because he may be incompetent at the time of execution; (11) the death penalty is unconstitutional because execution by electrocution and lethal injection are cruel or unusual or both; (12) Florida's capital sentencing statute is unconstitutional on its face and as applied because it fails to prevent arbitrary and capricious imposition of the death penalty; (13) the "murder in the course of a felony” aggravator is unconstitutional because it is an automatic aggravating factor; (14) the jury instruction on the pecuniary gain aggravator is overly broad and vague; (15) Florida’s capital sentencing structure is unconstitutional in light of
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (16) Florida’s capital sentencing structure is unconstitutional in light of
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); (17) Bradley is being denied effective legal representation because public records from various agencies have either not been provided or are incomplete in violation of chapter 119, Florida Statutes (2003); and (18) the cumulative effect of procedural and substantive errors in Bradley’s trial deprived him of a fair trial.
 

 [7]
 

 .
 
 Huff
 
 v.
 
 State,
 
 622 So.2d 982 (Fla.1993); see
 
 also Mordenti v. State,
 
 711 So.2d 30, 32 (Fla.1998) (explaining that the purpose of a
 
 “Huff
 
 hearing” is to allow the trial judge to determine whether an evidentiary hearing is required).
 

 [8]
 

 . The postconviction court reserved jurisdiction to set an evidentiary hearing on claims 11 and 17 if or when they became ripe for adjudication. It also ruled that the remainder of Bradley’s claims could be decided as a matter of law on the existing record.
 

 [9]
 

 . Pursuant to Standard Jury Instruction (Criminal) 3.6(7), Independent Act, the jury was instructed as follows:
 

 If you find that the crime alleged was committed, an issue in this case is whether the crime of murder was an independent act of a person other than the defendant. An independent act occurs when a person other than the defendant commits or attempts to commit a crime which the defendant did not intend to occur, and in which the defendant did not participate, and which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.
 

 If you find the defendant was not present when the crime of murder occurred, that does not, in and of itself, establish that the murder was an independent act of another. If you find that the murder was an independent act of another, then you should find Donald Lee Bradley not guilty of the crime of murder.
 

 [10]
 

 .
 
 See Mackerley v. State,
 
 900 So.2d 662, 663 (Fla. 4th DCA 2005) ("Luminol [is] a ‘presumptive test' for the presence of blood, which is generally accepted in the scientific community as a valid screening method [but] is not conclusive because certain chemicals or plant materials can also cause a Luminol reaction.”).
 

 [11]
 

 . In this Court’s discussion of premeditation in the direct appeal decision we stated:
 

 Bradley contends that the beating only indicates an intent to beat the victim up and scare some sense into him. As the McWhite brothers testified, however, Bradley not only continued to beat the victim to death, but he also attempted to shoot the victim in the head, an act most would agree would ordinarily contemplate death as a consequence.
 

 Bradley,
 
 787 So.2d at 739.
 

 [12]
 

 . The page at issue was obtained from the records received from an addiction recovery center called the Chemical Addiction Recovery Effort (CARE).
 

 [13]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [14]
 

 . According to the original trial record, the neuropsychological tests did not show any significant abnormality.
 

 [15]
 

 . On the aggravated assault charge, the court accepted Bradley's negotiated plea to a misdemeanor.
 

 [16]
 

 . This case is distinguishable from
 
 Williams v. State,
 
 987 So.2d 1 (Fla.2008), where the defense counsel was found ineffective for not presenting known, available and significant mitigation in order to provide necessary support for the jury’s recommendation of life, even though the "defense lawyer was aware that the presiding trial judge had already failed to follow life recommendations by other juries in the cases of Williams’ codefendants.”
 
 Id.
 
 at 12. We found that "counsel clearly missed the mark in overlooking our extensive case law that consistently requires some reasonable evidentiary basis for a life sentence in order to bar an override.”
 
 Id.
 
 at 12. We also noted that "it is apparent that defense counsel
 
 *680
 
 simply had nothing to lose in presenting this evidence at the
 
 Spencer
 
 hearing, thereby ensuring that such evidence would be in the record on appellate review.”
 
 Id.
 
 at 13. These are not the circumstances present in the instant case, where the jury recommended death by a vote of ten to two.
 

 [17]
 

 .
 
 See, e.g., Robertson v. State,
 
 699 So.2d 1343, 1347 (Fla.1997) (explaining that the jury could have concluded that consent to remain was withdrawn when defendant bound and blindfolded the victim and stuffed a brassiere down her throat);
 
 Jimenez v. State,
 
 703 So.2d 437, 441 (Fla.1997) (concluding that trier of fact could reasonably have found that after defendant brutally beat and stabbed victim, she withdrew her consent for defendant to remain in her residence and, thus, that defendant’s continued presence constituted burglary);
 
 Raleigh v. State,
 
 705 So.2d 1324, 1329 (Fla.1997) (holding that whatever consent the victim might have given to defendant to remain in victim’s home was withdrawn when defendant shot him several times and beat him viciously).
 

 [18]
 

 . Ch. 2001-58, § 1, Laws of Fla. (creating § 810.015(1), Florida Statutes (2002)).
 

 [19]
 

 . Bradley’s case was still pending in this Court on direct appeal when
 
 Delgado
 
 was issued. At oral argument, the parties argued about the application of
 
 Delgado.
 
 In the final decision in
 
 Bradley,
 
 however, we did not address the issue. Instead, without mentioning
 
 Delgado,
 
 we simply stated that "the record reveals that Bradley had many opportunities at trial to object to the submission of the burglary issue but failed to do so. Bradley is therefore barred from raising this issue now.”
 
 Bradley,
 
 787 So.2d at 740.
 

 [20]
 

 . We note that under
 
 Strickland
 
 the focus of the inquiry is on the proceeding in which the alleged error occurred.
 
 See Strickland,
 
 466 U.S. at 696, 104 S.Ct. 2052;
 
 see also Purvis v. Crosby,
 
 451 F.3d 734, 739 (11th Cir.2006) ("The Supreme Court in
 
 Strickland
 
 told us that when the claimed error of counsel occurred at the guilt stage of a trial (instead of on appeal) we are to gauge prejudice against the outcome of the trial ... not on appeal.”);
 
 Strobridge v. State,
 
 1 So.3d 1240, 1242 (Fla. 4th DCA 2009) ("The prejudice in counsel’s deficient performance [in failing to preserve error for appeal] is assessed based upon its effect on the results at trial, not on its effect on appeal.”) In this case, the focus should be on Bradley’s jury trial. Thus, Bradley’s contention that if counsel had challenged his burglary charge at trial, his appeal would have succeeded in vitiating any felony-murder count poses an incorrect inquiry. The proper focus of the inquiry is whether, if counsel had objected below to the burglary count, there is a reasonable probability that the outcome of the trial would have been different. As we have noted, there is no reasonable probability that the result would have been any different, a reasonable probability being a probability sufficient to undermine confidence in the outcome.
 

 [21]
 

 . The motions alleged that Florida’s capital sentencing statutes (sections 921.141, 782.04, and 922.10, Florida Statutes (1995)) were unconstitutional because: (1) the listed statutory
 
 *685
 
 aggravating factors are unconstitutionally vague, overbroad, arbitrary, and capricious; (2) they provide for arbitrary jury overrides and for arbitrary sentencing; (3) they do not instruct the jury to give mitigating circumstances enough weight and the death penalty is unconstitutional; (4) they should require separate juries for the guilt and penalty phases; (5) the aggravating circumstance that the murder was committed during commission of a felony is unconstitutional as automatic; (6) electrocution is cruel and unusual punishment; and (7) the HAC aggravating factor is unconstitutional.