# Supreme Court of Florida

_____

No. SC12-677
_____

**JERMAINE LEBRON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[January 30, 2014]

PER CURIAM.

Jermaine Lebron seeks review of an order of the circuit court that denied his motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

## FACTS AND PROCEDURAL HISTORY

A jury convicted Jermaine Lebron of the 1995 first-degree murder and robbery with a firearm of Larry Neal Oliver. See Lebron v. State, 799 So. 2d 997, 1004 (Fla. 2001) (Lebron I). In affirming Lebron's convictions, this Court detailed the facts surrounding the murder:

According to eyewitnesses, [Oliver, who worked with one of Lebron's acquaintances, Danny Summers,] had been lured to a house in Osceola County (the "Gardenia house") where Lebron and several others were staying after Lebron offered to sell [Oliver] some "spinners" for his truck. Shortly after [Oliver] arrived at the home, Lebron called to him to come toward the back bedrooms. As [Oliver] entered the hallway leading to the bedrooms, he was forced to lie face down, and was shot at short range in the back of the head. . . . Money, checks, and a credit card were taken from [Oliver], and stereo equipment was stripped from his truck. Lebron directed others present at the time to burn [Oliver's] identification papers, to dispose of [his] body, and to clean up the area where [he] had been shot.

Over the next several days, Lebron and some of the others used [Oliver's] credit card, pawned his stereo equipment, and cashed his checks. An attempt was also made to burn [Oliver's] truck. . . . Shortly thereafter, Lebron left for New York City, the place where "Legz Diamond," a topless juice bar owned by his mother, was located.

[Oliver's] body was later discovered in a rural area near the Walt Disney World property. Although the body was covered with a blanket and some shrubs, it was still visible from the road.

The medical examiner, Dr. Julia Martin, performed the autopsy on Oliver's body after it was discovered. She testified that . . . [t]here were no bruises to the hands consistent with defensive wounds. The cause of death, which was instantaneous, was from a shotgun wound to the head.

After Lebron left for New York, the others having knowledge of the event reported the murder to law enforcement officers. . . . All of the witnesses other than the Tocci brothers gave statements which were consistent throughout, and also consistent with what the police were able to verify with evidence and other statements (such as where the body was hidden; where the truck was burned; how the checks were cashed; and where Oliver's property was pawned).

At about the same time, a crime-scene investigation was being conducted by the Osceola County Sheriff's Department. Investigators observed several drops of what appeared to be dried blood in a big area at the southeast bedroom door of the home where the event allegedly occurred. They also discovered what appeared to be blood that had some foreign substance on it. The area was at least twelve to

fourteen inches in diameter. A very strong stench of dried blood was detected immediately upon entering the residence.

Plastic balls were found inside the southeast bedroom, along with sponges and pellets. A spent Winchester twelve-gauge pheasant shotgun shell was found in a drawer in another bedroom. In a third bedroom, the police found four shotgun shells and the decedent's ring in a pair of sneakers.

Shortly after these eyewitness reports were made to law enforcement, Lebron, accompanied at the time by Stacie Kirk and Howard Kendall (who was involved in burning Oliver's truck), was apprehended in a car parked on the street outside of Legz Diamond, and arrested. Incident to the arrest, a search of the vehicle was conducted, and a day planner was recovered from the center console underneath the dashboard between the passenger seat and the driver's seat. Upon opening the planner, an identifying card with the name "Larry N. Oliver" was found. Detective Rodriguez retrieved the planner and secured it for safekeeping. He also found four shotgun shells in the center console.

Id. at 1001-02.

Lebron's first trial resulted in a mistrial due to a jury deadlock. Id. at 1001. During the guilt phase of the second trial, the jury found the following on special verdict forms: (1) Lebron was guilty of first-degree felony murder; (2) Oliver was killed by someone other than Lebron; (3) Lebron did not possess a firearm during the commission of the felony murder; (4) Lebron was guilty of robbery with a firearm; and (5) Lebron possessed a firearm during the commission of the robbery. Id. at 1004. During the penalty phase for this proceeding, the jury recommended the death penalty by a vote of seven to five and the trial court sentenced Lebron to death. Id. at 1006-08. In 2001, this Court affirmed Lebron's convictions but vacated the death sentence and remanded for a new penalty phase because the trial

court erred when it: (1) found the felony probation aggravating factor, in violation of the ex post facto doctrine; and (2) rejected the minor participant mitigating factor based on an improper finding that Lebron shot Oliver, which was contrary to the special finding of the jury that someone other than Lebron shot Oliver. Id. at 1020-22.[1]

After a second penalty phase, a jury again recommended the death penalty by a vote of seven to five. Lebron v. State, 894 So. 2d 849, 852 (Fla. 2005) (Lebron II). The trial court again sentenced Lebron to death. Id. In 2005, this Court vacated that death sentence and remanded for a third penalty phase because we concluded that the probative value of the evidence presented to establish the prior violent felony aggravating factor was far outweighed by its prejudicial effect. Id. at 853-56.

After a third penalty phase ended in a mistrial, a fourth penalty phase was held on August 16, 2005. Lebron v. State, 982 So. 2d 649, 656 (Fla. 2008) (Lebron III). During that proceeding, the State presented the testimony of Detective Andrew Lang, who provided a summary of the facts surrounding

---

1. On direct appeal, Lebron raised the following guilt phase claims: (1) double jeopardy barred Lebron's retrial; (2) the trial court erred when it denied Lebron's motion to continue the retrial due to the absence of trial counsel; and (3) the trial court erred when it denied Lebron's motion to recuse based upon an alleged ex parte communication between the judge and the prosecutor regarding a scheduling matter. Lebron I, 799 So. 2d at 1008 n.8.

Oliver's murder.  Id.  The State also presented victim impact evidence from Oliver's mother and exhibits which included: (1) proof of Lebron's prior violent felony convictions; (2) pictures of the deceased Oliver and the hallway at the crime scene; and (3) evaluations of mental health professionals who analyzed Lebron. Id. at 656.

The defense presented only Jocelyn Ortiz, Lebron's mother, who testified with regard to her relationship with Lebron and his troubled childhood.  Id.  The defense also introduced exhibits which included: (1) the charges and convictions of the other individuals involved in the Oliver murder; (2) reports with regard to Lebron's prior arrest in New York for attempted robbery (which disclosed that he was seventeen at the time, and that a codefendant possessed a gun during the crime); and (3) reports addressing Lebron's attendance and performance at various schools and group homes during his teenage years.  Id.

Again, the jury returned a recommendation of death by a vote of seven to five.  Id.  The jury found that three aggravating factors had been established, for which the trial court required the jurors to record a numerical vote for each: (1) Lebron had been convicted of a prior violent felony (twelve to zero); (2) the murder of Oliver was committed while Lebron was engaged in a robbery (twelve to zero); and (3) the murder of Oliver was committed for financial gain (nine to three).  Id. at 656 n.4.  The jury also found the following with regard to mitigation:

(1) Lebron was not merely an accomplice whose participation was relatively minor (twelve to zero); (2) Lebron's age was not a mitigating factor (twelve to zero); (3) no aspect of Lebron's character, record, or background was a mitigating factor (nine to three); and (4) no other circumstance of the murder was a mitigating factor (twelve to zero). Id. at 656 n.5.

On October 20, 2005, the trial court conducted a Spencer[2] hearing. Id. at 657. During that hearing, the trial court considered the testimony of State witness Howard Kendall, who testified regarding Lebron's involvement in a separate and unrelated criminal trial that involved victim Roger Nasser.[3] The defense presented various school records and asserted that the aggravating factors should receive limited weight because: (1) this Court does not typically give great weight to either the during the course of a robbery or the pecuniary gain aggravator, and here, the robbery also benefited other individuals involved in its commission; (2) when Lebron committed the attempted robbery in New York, he was a juvenile and an accessory as evidenced by his probation sentence, and the main culprit used a gun that contained blanks; (3) Lebron was provoked by Brandi Gribben's threats,

---

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

3. Lebron was convicted of robbing and kidnapping Nasser. The incident in question occurred approximately one week after Oliver's murder. Lebron III, 982 So. 2d at 657 n.7.

which mitigates the aggravated assault that he committed against her;[4] and (4) Lebron did not possess a firearm when he robbed and kidnapped Nasser. Id. Conversely, the State presented a summary of psychological reports and asserted that Lebron unjustifiably murdered Oliver. Id.

On December 27, 2005, the trial court for the third time sentenced Lebron to death. Id. The court found that the State had proven beyond a reasonable doubt that: (1) Lebron was previously convicted of a violent felony; and (2) the capital felony was committed while Lebron was engaged in or an accomplice in the commission of a robbery (the court merged this aggravating factor with the financial gain aggravating factor). Id. The trial court did not assign these aggravating factors a particular weight, but rather found them to be "present." Id. at 667. The trial court did not find any statutory mitigating factors, but did find the following nonstatutory mitigation with regard to Lebron: (1) his mother used drugs (very little weight); (2) he performed poorly in school (some weight); (3) he was good with children (very little weight); (4) the profile of his parents was mitigating (very little weight); (5) his mother rejected him and had negative feelings about him (some weight); (6) he behaved properly during trial (very little weight); and (7) he had emotional and mental health problems, and he lacked the "world's best

_____

4. Lebron was convicted of aggravated assault with a firearm against Gribben. This incident occurred only a few days before Oliver's murder. Id. at 657 n.8.

mother" (little weight). Id. Finally, the trial court found that the death sentence was supported by an Enmund[5]-Tison[6] analysis because Lebron was a major participant in the murder of Oliver, and Lebron had demonstrated a reckless disregard for human life. Id. at 657-58.

On appeal, Lebron raised six claims alleging: (1) the trial court erred in its mitigation findings when it considered and relied on evidence not contained in the record; (2) the trial court improperly required the jurors to record a numerical vote for findings with regard to each aggravating and mitigating factor presented; (3) Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002); (4) Florida's standard penalty phase jury instructions are unconstitutional; (5) execution by lethal injection constitutes cruel and unusual punishment; and (6) the imposition of the death sentence here is disproportionate. Id. at 658-70.

With respect to the first claim, we held that the trial court, in the sentencing order, relied on information that had not been introduced during the 2005 penalty phase in finding the existence of aggravating and mitigating factors. Id. at 658. However, we conducted an independent review of the evidence from the 2005

---

5. Enmund v. Florida, 458 U.S. 782 (1982).

6. Tison v. Arizona, 481 U.S. 137 (1987).

penalty phase proceedings, and denied the claim.  Id. at 659-64.  We then denied

the remainder of Lebron's claims and affirmed his sentence of death.  Id. at 670.

**Proceedings Below**

On June 18, 2009, Lebron filed a Motion to Vacate Judgment of Convictions

and Sentences.  In claim one, Lebron alleged that counsel was ineffective during

his second guilt phase trial for the failure to: (A) file a motion to suppress based

upon an illegal search of the vehicle Lebron was in when arrested in New York;

(B) present Robert Spears and Charlotte Spears as witnesses; (C) properly conduct

jury selection, including counsel's failure to (1) object to the improper questioning

and dismissal of an African-American juror, (2) ensure that the law was properly

explained to the jury, and (3) move to strike a panel of jurors or effectively

rehabilitate the panel; (D) move for a mistrial based on the State's improper

opening statement that referenced witnesses and evidence that were not presented

during trial, as well as references to collateral crimes; (E) properly impeach State

witnesses; (F) move for a mistrial based on the improper introduction of other

crimes evidence; (G) present Roswell Summers to rebut the testimony of Danny

Summers; and (H) object to the speculative and hearsay testimony of Detective

Martin Rodriguez.

In claim two, Lebron alleged that counsel was ineffective during his fourth

penalty phase trial for the failure to: (A) conduct a reasonably competent

mitigation investigation and to present mitigation concerning Lebron's background and history; (B) present evidence of Lebron's drug use during the weeks and months before the homicide; (C) present evidence of incomplete brain development; (D) present positive prisoner evidence; (E) present expert testimony with regard to Lebron's mental illness and cognitive brain dysfunction; (F) present expert testimony with regard to Lebron's adverse development; (G) properly appeal the Nasser convictions which led to the imposition of the prior violent felony aggravator; and (H) present evidence and expert testimony about Lebron's activities from ages 18 to 21 and establish that his adverse development, mental health, and neurological problems were present at the time of the homicide. In addition, Lebron claimed cumulative error during both the guilt and penalty phases of his trial. Lebron also alleged that section 945.10, Florida Statutes (2009), infringes on his constitutional rights by preventing him from knowing the identity of the members of the execution team. Finally, Lebron asserted that by executing him, the State will violate the Eighth Amendment prohibition against cruel and unusual punishment because he may be incompetent at the time of execution.

Following a case management conference/Huff[7] hearing, the postconviction court ordered an evidentiary hearing on claims 1(B), 1(G), 2(A), 2(B), 2(D), 2(E), 2(F), 2(G), and 2(H). The evidentiary hearing was held on November 7-10, 2011.

    7. Huff v. State, 622 So. 2d 982 (Fla. 1993).

- 10 -

In addition to his own testimony, Lebron presented three witnesses. Dr. Mark Cunningham, a clinical forensic psychologist, testified that Lebron exhibited thirty-two major adverse developmental factors that impacted Lebron's childhood, his teen years, and his moral culpability. Dr. Hyman Eisenstein, a neuropsychologist and an expert in the fields of clinical psychology, forensic psychology, and neuropsychology, diagnosed Lebron with six psychiatric and behavioral disorders and determined that Lebron suffers from functional brain impairment, frontal lobe impairment, and cognitive brain dysfunction. Dr. Eisenstein also concluded that Lebron suffered from extreme mental disturbance at the time of the murder. Robert Norgard, Lebron's penalty phase counsel, testified about the strategy he and co-counsel Harvey Slovis developed during their representation of Lebron. The State presented one witness, Dr. Jeffrey Danziger, a psychiatrist and expert in forensic psychiatry and addictionology, who refuted the findings of Dr. Cunningham and Dr. Eisenstein and diagnosed Lebron with, among other things, antisocial personality disorder.

On March 13, 2012, the postconviction court issued an order denying all claims presented in Lebron's motion to vacate. This appeal follows.

# ANALYSIS

## Standard of Review

Lebron first challenges the postconviction court's denial of his eight guilt phase claims. Ineffective assistance of counsel claims are evaluated in accordance with the United States Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). We have previously described what a defendant must establish to succeed on a claim that trial counsel was ineffective:

> [T]he test when assessing the actions of trial counsel is not how, in hindsight, present counsel would have proceeded. <u>See</u> <u>Cherry v. State</u>, 659 So. 2d 1069, 1073 (Fla. 1995). On the contrary, a claim for ineffective assistance of trial counsel must satisfy two criteria. First, counsel's performance must be shown to be deficient. <u>Strickland</u>[, 466 U.S. at 687]. Deficient performance in this context means that counsel's performance fell below the standard guaranteed by the Sixth Amendment. <u>Id.</u> When examining counsel's performance, an objective standard of reasonableness applies, <u>id.</u> at 688, and great deference is given to counsel's performance. <u>Id.</u> at 689. The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " <u>Id.</u> (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)). This Court has made clear that "[s]trategic decisions do not constitute ineffective assistance of counsel." <u>See</u> <u>Occhicone v. State</u>, 768 So. 2d 1037, 1048 (Fla. 2000) [(Occhicone II)]. There is a strong presumption that trial counsel's performance was not ineffective. <u>See</u> <u>Strickland</u>, 466 U.S. at 669.
>
> Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result. [<u>Id.</u> at] 689. A defendant must do more than speculate that an error affected the outcome. <u>Id.</u> at 693. Prejudice is met only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome." Id. at 694. Both deficient performance and prejudice must be shown. Id.

Bradley v. State, 33 So. 3d 664, 671-72 (Fla. 2010) (parallel citations omitted). Because Strickland requires that a defendant establish both deficiency and prejudice, an appellate court evaluating a claim of ineffectiveness is not required to issue a specific ruling on one component of the test when it is evident that the other component is not satisfied. See Mungin v. State, 932 So. 2d 986, 996 (Fla. 2006).

Further, we examine ineffective assistance claims under a mixed standard of review because the performance and prejudice elements of Strickland present mixed questions of law and fact. Bradley, 33 So. 3d at 672. Postconviction courts hold a superior vantage point with respect to questions of fact, evidentiary weight, and observations of the demeanor and credibility of witnesses. See Cox v. State, 966 So. 2d 337, 357-58 (Fla. 2007). As a result, this Court defers to the postconviction court's factual findings so long as those findings are supported by competent, substantial evidence. See Bradley, 33 So. 3d at 672. However, this Court reviews the postconviction court's legal conclusions de novo. Id.

## Guilt Phase Claims[8]

## Failure to File a Motion to Suppress

Shortly after eyewitness reports of Oliver's murder were received by law enforcement, Lebron, Stacie Kirk, and Howard Kendall were apprehended in a parked stolen Chevy Blazer which was located on the street outside Legz Diamond in New York. Lebron I, 799 So. 2d at 1002. All three individuals were ordered out of the vehicle, and Lebron and Kendall were immediately taken into custody. Id. Incident to the arrest, Detective Rodriguez searched the vehicle. Id. A day planner was recovered from the center console, and inside the planner was an identification card with the name "Larry N. Oliver." Id. Detective Rodriguez also found four shotgun shells in the center console. Id.

Lebron alleges that his trial counsel performed deficiently when he failed to file a motion to suppress the evidence discovered during the search of the stolen Chevy Blazer. He contends that Chimel v. California, 395 U.S. 752, 763 (1969), permits law enforcement officers to conduct a search of an automobile incident to

_____

8. Before addressing Lebron's guilt phase claims, we note that both Norgard and Slovis represented Lebron during his first guilt phase trial, which ended in a mistrial. During retrial, however, Norgard was involved in another capital case, and was unable to participate in the pretrial and guilt phase proceedings. Lebron I, 799 So. 2d at 1001. These proceedings were conducted with only Slovis appearing on Lebron's behalf. Id. Nevertheless, Norgard did represent Lebron during all four of his penalty phase proceedings. During the evidentiary hearing, Lebron did not present Slovis as a witness, but instead relied exclusively upon the testimony of Norgard even though Lebron challenges several aspects of Slovis' performance during his 1998 guilt phase trial.

arrest only to protect an officer's safety or to prevent the destruction of evidence. Thus, Lebron claims that the search of the stolen Blazer was unjustified and illegal because the two justifications that support the search incident to arrest warrant exception were not present as he and the other individuals were already in police custody.

Without addressing deficiency, we conclude that this claim fails the prejudice prong of Strickland. To establish prejudice as a result of trial counsel's failure to file a motion to suppress, a defendant must demonstrate that the motion would have been successful, and the evidence in question would have been excluded. See Zakrzewski v. State, 866 So. 2d 688, 694 (Fla. 2003) ("[W]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious." (quoting Kimmelman v. Morrison, 477 U.S. 365, 375 (1986)).

The United States Supreme Court has held that, subject only to a few well-delineated exceptions, searches conducted without prior judicial approval are per se unreasonable under the Fourth Amendment. Katz v. United States, 389 U.S. 347, 357 (1967). Among the exceptions to the warrant requirement is a search incident to a lawful arrest. See Weeks v. United States, 232 U.S. 383, 392 (1914). In Chimel, the Supreme Court held that a search incident to an arrest may only

include the arrestee's person and the area "within his immediate control," which includes the area within which the arrestee might gain possession of a weapon or destructible evidence. 395 U.S. at 763. The search conducted in <u>Chimel</u> occurred inside the home of the defendant. <u>Id.</u> at 753. Twelve years after <u>Chimel</u>, the Supreme Court considered the applicability of the search incident to arrest exception in the context of automobile searches. <u>See</u> <u>New York v. Belton</u>, 453 U.S. 454, 460 (1981). In <u>Belton</u>, the Supreme Court held that when an officer lawfully arrests the occupant of an automobile, the officer may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile and any containers therein. <u>Id.</u> This holding was

> widely understood to allow a vehicle search incident to the arrest of a recent occupant <u>even if there is no possibility the arrestee could gain access to the vehicle at the time of the search</u>. This reading may be attributable to Justice Brennan's dissent in <u>Belton</u>, in which he characterized the Court's holding as resting on the "fiction . . . that the interior of a car is <u>always</u> within the immediate control of an arrestee who has recently been in the car." [453 U.S.] at 466. Under the majority's approach, he argued, "the result would presumably be the same even if [the officer] had handcuffed Belton and his companions in the patrol car" before conducting the search. <u>Id.</u> at 468.
>    Since we decided <u>Belton</u>, Courts of Appeals have given different answers to the question whether a vehicle must be within an arrestee's reach to justify a vehicle search incident to arrest, but Justice Brennan's reading of the Court's opinion has predominated. As Justice O'Connor observed, "lower court decisions seem now to treat the ability to search a vehicle incident to the arrest of a recent occupant as a police entitlement rather than as an exception justified by the twin rationales of <u>Chimel</u>." <u>Thornton</u> [v. United States], 541 U.S. [615, 624 (2004)] (opinion concurring in part). Justice Scalia has similarly noted that, although it is improbable that an arrestee could

gain access to weapons stored in his vehicle after he has been handcuffed and secured in the backseat of a patrol car, cases allowing a search in "this precise factual scenario . . . are legion." Id. at 628 (opinion concurring in judgment) (collecting cases). Indeed, some courts have upheld searches under Belton" even when . . . the handcuffed arrestee has already left the scene." 541 U.S. at 628 (same).

Arizona v. Gant, 556 U.S. 332, 341-43 (2009) (parallel citations; footnote omitted). This interpretation of Belton predominated until 2009—twelve years after Lebron's first guilt phase trial—when the Supreme Court in Gant rejected this broad reading of Belton and narrowed the search incident to arrest exception to permit police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search or when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Id. at 343.[9]

As the recent holding of the Supreme Court in Gant indicates, the law in effect at the time of Detective Rodriguez's search of the stolen Chevy Blazer incident to the arrest of Lebron was well settled. Under Belton, law enforcement officers were permitted to search a vehicle incident to the arrest of a recent occupant even if there was no possibility the arrestee could gain access to the

---

9. As noted by the Fourth District in Flowers v. State, 54 So. 3d 1049, 1049 (Fla. 4th DCA 2011), the United States Supreme Court's decision in Gant is "an evolutionary refinement in Fourth Amendment law and not a development of fundamental significance, a major constitutional change, or jurisprudential upheaval that requires retroactive application."

vehicle at the time of the search. See Gant, 556 U.S. at 342. At the time of the search, Detective Rodriguez knew there was an active arrest warrant for Lebron for the murder and armed robbery of Oliver. He also knew that Lebron and his accomplices were driving a stolen Chevy Blazer. It was reasonable for Detective Rodriguez to believe the stolen vehicle contained relevant evidence relating to those crimes and it was lawful under Belton for him to search the car incident to placing Lebron and Kendall into custody. This Court has "consistently held that trial counsel cannot be held ineffective for failing to anticipate changes in the law," Cherry v. State, 781 So. 2d 1040, 1053 (Fla. 2000), and Lebron cannot now rely upon the later holding in Gant to contend that his counsel performed ineffectively by failing to file a meritless motion to suppress. See Johnston v. State, 63 So. 3d 730, 740 (Fla. 2011) (holding that counsel cannot be deemed ineffective for failing to file a meritless motion).

Furthermore, even if we were to assume that Detective Rodriguez's search of the vehicle was improper under the search incident to arrest warrant exception, the evidence discovered in the stolen car would still have been admissible because the fruit of the poisonous tree doctrine does not automatically render any and all evidence inadmissible. See Moody v. State, 842 So. 2d 754, 759 (Fla. 2003). A court may admit evidence obtained outside the scope of a warrant exception if the State can show that: (1) an independent source existed for the discovery of the

- 18 -

evidence; (2) the evidence would have inevitably been discovered in the course of a legitimate investigation; or (3) sufficient attenuation existed between the challenged evidence and the illegal conduct. Here, the second exception applies. See Nix v. Williams, 467 U.S. 431, 447 (1984). Lebron was apprehended in a stolen Chevy Blazer. That vehicle, as direct evidence of a car theft and not lawfully in the possession of its owner, would have been held by law enforcement and subject to an inventory search. See Rolling v. State, 695 So. 2d 278, 294 (Fla. 1997). That search would have independently led the police to the challenged evidence notwithstanding Lebron's allegation of police misconduct. See Moody, 842 So. 2d at 759. Accordingly, this evidence was properly admitted under either the search incident to arrest exception to the warrant requirement or the inevitable discovery exception to the exclusionary rule. As a result, Lebron has failed to satisfy the prejudice prong of Strickland because he has failed to provide a basis upon which the motion would have successfully led to the exclusion of evidence in question. See Zakrzewski, 866 So. 2d at 694. We deny relief on this claim.

**Failure to Present Robert and Charlotte Spears as Witnesses During Trial**

Lebron next alleges that Robert and Charlotte Spears reported that they saw two white males drive the victim's truck eastbound on Interstate 4 toward Daytona Beach between the time of the homicide and the discovery of the victim. Lebron claims this testimony was critical because it would have supported his recorded

statement to police that he never saw the victim's truck and contradicted testimony presented by the State regarding the location of the truck during that time. This claim fails for several reasons.

First, it is insufficiently pled. Lebron does not allege specific facts in support of his claim that counsel provided deficient performance that prejudiced his guilt phase trial. See Spera v. State, 971 So. 2d 754, 758 (Fla. 2007) (holding that a motion claiming ineffective assistance must include facts in support of both deficient performance of counsel and prejudice to the defendant, and instructing that the failure to sufficiently allege both prongs will result in summary denial of the claim); see also Rhodes v. State, 986 So. 2d 501, 513-14 (Fla. 2008). Rather, Lebron's strongest allegation of ineffectiveness with regard to this claim is that "Norgard's recollection regarding several important aspects of the trial preparation [was] suspect at best." Even though Lebron felt this evidence was "critical," his mere feelings about the strength of a claim do not constitute sufficient facts to establish both deficient performance and prejudice.

Further, Lebron's claim is also facially insufficient because he has failed to demonstrate that either Robert or Charlotte Spears would have been willing or able to testify during Lebron's 1998 guilt phase trial. See Melton v. State, 949 So. 2d 994, 1003 (Fla. 2006) ("If a witness would not have been available to testify at trial, then the defendant will not be able to establish deficient performance or

prejudice from counsel's failure to call, interview, or investigate that witness.")

(quoting Nelson v. State, 875 So. 2d 579, 583 (Fla. 2004)). In Nelson, this Court

held that to present a facially sufficient claim alleging the ineffectiveness of

counsel for failing to present certain witnesses, a postconviction motion must

include an assertion that those witnesses would in fact have been available to

testify at trial. 875 So. 2d at 584. Here, not only does Lebron's postconviction

motion fail to specifically allege that either Robert or Charlotte Spears would have

been available to testify, but Lebron's postconviction counsel stated during the

evidentiary hearing that he was unsuccessful in his attempts to locate the Spears.

Thus, Lebron has failed to present any evidence demonstrating that the Spears

would have been able to testify during Lebron's 1998 trial. Further, the alleged

evidence was never presented.

Second, Lebron has failed to demonstrate that his trial counsel performed

deficiently. During the evidentiary hearing, counsel testified that he did not

specifically remember the Spears; however, he did recall that based on testimony

and evidence presented during trial, the defense made a strategic decision not to

present a case because it wanted to retain the ability to have the last word with the

jury before deliberations.[10] This testimony suggests a carefully considered and

10. At the time of Lebron's 1998 guilt phase trial, Florida Rule of Criminal
Procedure 3.250 provided that "a defendant offering no testimony in his or her own
behalf, except the defendant's own, shall be entitled to the concluding argument

- 21 -

planned defense and provides a proper evidentiary basis for the trial court's denial

of relief on this claim. See Occhicone II, 768 So. 2d at 1048 (holding that defense

counsel's decision not to present evidence or witnesses because counsel believed

that it was more important to have the first and last closing arguments did not

constitute deficient performance). Accordingly, we deny relief on this claim.

### Failure to Properly Conduct Jury Selection

Lebron next alleges that counsel Slovis was not qualified to conduct jury

selection in a death penalty case, and contends that Slovis performed deficiently in

three ways. First, Lebron alleges that Slovis failed to properly object to the

striking of Juror Simmons—one of only two African-Americans in the venire—

after the trial court struck the juror for cause due to financial hardship.

---

before the jury." In re Amend. to the Fla. Rules of Crim. Pro.-Final Arguments, 957 So. 2d 1164, 1165 (Fla. 2007). In 2006, the Legislature created a new statutory provision, section 918.19, Florida Statutes, governing closing statements in criminal trials. The statute provides that the prosecution shall present the first closing, the defendant may respond, and the prosecution may then reply in rebuttal. Id. at 1166. In response to the change in the law, this Court amended rule 3.250 to eliminate the portion of the rule providing that the defense has the right to conclude closing statements if the defendant offered no evidence during trial other than his or her own testimony. Id. We also adopted Florida Rule of Criminal Procedure 3.381 which states that in all criminal prosecutions, "the prosecuting attorney shall be entitled to an initial closing argument and a rebuttal closing argument before the jury or the court sitting without a jury." See F. R. Crim. P. 3.381; see also Id. at 1166-67. Thus, although it is not currently the law, at the time of Lebron's trial, the rules of criminal procedure provided a strategic advantage to defense counsel for not presenting witness testimony.

During jury selection, Juror Simmons testified that his commute to the courthouse involved an hour-and-a-half to two-hour bus ride on two different buses, and that he could not afford to continue to pay for bus trips to the courthouse. The trial court indicated that it would excuse Juror Simmons for financial hardship if there were no objections. Lebron's counsel objected and offered to have his driver provide the juror with transportation to the courthouse. Slovis further requested that the court require the State to provide bus fare for the prospective juror. Without addressing Slovis' request, the court excused the juror for cause due to financial hardship. Lebron acknowledges that counsel objected to Juror Simmons' dismissal; however, he contends that counsel was ineffective for failing to question Juror Simmons regarding the extent of his financial hardship. The postconviction court denied this claim noting,

> Lebron cites no authority for his argument that counsel should have pursued alternate transportation to enable Mr. Simmons to attend jury duty, and this Court finds none. It is highly unlikely that funds would have been available in the trial court's budget to provide bus fare for one particular juror or that the Sheriff would have been willing to transport him. Whether any of the suggested accommodations would have been possible or would have alleviated Mr. Simmons' financial hardship, the fact remains that counsel did object when this potential juror was stricken from the panel. Therefore, the issue was properly preserved for appeal, and he cannot establish prejudice.

Essentially, Lebron alleges that his counsel performed deficiently by failing to "ensure" that one of only two prospective African-American jurors was provided with a sufficient opportunity to serve on the jury. This claim fails under

- 23 -

both the deficiency and prejudice prongs of <u>Strickland</u>. When the court excused Juror Simmons for cause, trial counsel Slovis objected in a timely and proper manner. By objecting, Slovis alerted the trial court that it may have erred in excusing Juror Simmons, and provided the court with a possible solution as well as an opportunity to correct the error immediately. <u>Strickland</u> does not require counsel to ask every question the client thinks is appropriate, and counsel cannot be deemed deficient simply because he or she did not preserve the client's desired jury makeup or because he or she failed to object as fervently as the client wishes. We conclude that Slovis performed appropriately during jury selection, and that his representation of Lebron did not fall below the objective standards of reasonableness delineated in <u>Strickland</u>.

Second, Lebron alleges counsel failed to ensure that prospective jurors <u>during the 1998 penalty phase</u> were properly informed as to the law governing the imposition of the death penalty. The postconviction court denied this claim, noting that Lebron did not challenge the information given to prospective jurors prior to the 2005 penalty phase. As the postconviction court correctly noted, the only relevant penalty phase occurred in 2005, and any claim associated with the 1998 penalty phase—the first of four penalty phases—is irrelevant. <u>See</u> <u>Lebron I</u>, 799 So. 2d at 1021.

Third, Lebron alleges counsel performed ineffectively when he failed to move to strike the jury panel or properly rehabilitate the panel after Juror Rombach stated that it would be difficult for him to believe that a law enforcement officer would testify untruthfully. Lebron acknowledges that counsel moved to strike this prospective juror for cause, but contends that counsel performed ineffectively when he did not present the trial court with case law demonstrating that it was erroneous not to excuse Juror Rombach for cause.

When Juror Rombach's panel entered the courtroom, the parties had already selected twelve jurors and one alternate. Those jurors were dismissed from the courtroom and a new panel, which included Juror Rombach, was seated and questioned for the purpose of selecting a second alternate juror. During the course of questioning Juror Rombach's panel, both the State and the defense backstruck one previously approved juror from the first panel, leaving three open spots (one juror and two alternates) to fill. While other prospective jurors remained in the courtroom, Juror Rombach, a former police officer, strongly indicated during voir dire that he would likely find the testimony of a police officer to be more credible than a normal witness because of the procedural checks—i.e., police reports, supervisor checks, and grand jury proceedings—he believed increased the credibility of officer testimony during trial. Lebron's counsel objected to Juror Rombach's testimony and moved to strike him for cause.

DEFENSE COUNSEL: It is not proper to let a prospective juror who was a police officer to tell this jury panel and pollute it with things like, well, generally I know they go through their reports and check their reports and supervisors have taken care of it, they're going to tell the truth when they come here; that's not for a jury to hear, and that is improper and prejudicial questioning.

The only question that's of importance is, is he going to take what a police officer says more than he would from a regular citizen, is he predisposed to believe a police officer.

THE COURT: The only problem with cause is the case law in the State of Florida indicates there is no problem with a juror giv[ing] a police officer's testimony great weight.

The court denied the challenge for cause, and defense counsel struck Juror Rombach peremptorily. We conclude that defense counsel Slovis acted properly and not deficiently when he articulated a clear objection to the State's questioning of Juror Rombach, by challenging Juror Rombach for cause and, when that challenge was denied, struck him peremptorily.

Moreover, we have previously held that to demonstrate prejudice in the denial of challenges for cause in a postconviction proceeding, the defendant must show that one of the jurors on the panel was actually biased. See Carratelli v. State, 961 So. 2d 312, 323 (Fla. 2007). Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial, and the evidence of bias must be plain on the face of the record. Id. Of the prospective jurors present in the courtroom at the time Juror Rombach was questioned and struck, only three—Denise Annas (juror), Melba Anderson (alternate), and

Rebecca Riehm (alternate)—sat on the jury. Only Juror Annas was a member of the panel that reached a verdict. Therefore, the only juror Lebron could assert was prejudicially impacted by Juror Rombach's comments was Juror Annas. However, Lebron does not allege that Juror Annas, or any other juror who served on the panel, was actually biased. As a result, we conclude that Lebron has not satisfied the requisite prejudice standard because he has failed to demonstrate that a member of the jury who adjudicated Lebron's guilt was actually biased.

For the reasons stated above, we affirm the postconviction court's denial of this claim, as all three subclaims lack merit.

### Failure to Move for a Mistrial—Prosecutor's Opening Statement

Lebron contends that his counsel was ineffective for failing to move for a mistrial when the State, during its opening statement, referred to physical and testimonial evidence that was not ultimately introduced during trial. He contends that the prosecutor's opening statement, which referenced witnesses Jesenia Ortiz, Carmen Berrios, and Martin Bullard, served as an improper conduit for the State to present evidence that Lebron attempted to illegally manufacture an alibi by bribing and threatening witnesses without affording Lebron with an opportunity to rebut those allegations. Lebron also alleges that the State's opening statement with

respect to these witnesses resulted in the erroneous admission of <u>Williams</u>[11] rule evidence.

In Florida, a prosecutor's comments will merit a mistrial only when they deprive the defendant of a fair and impartial trial, materially contribute to the conviction, are so harmful or fundamentally tainted as to require a new trial, or are so inflammatory they might have influenced the jury to reach a more severe verdict than it would have otherwise rendered. <u>Spencer v. State</u>, 645 So. 2d 377, 383 (Fla. 1994); <u>see also</u> <u>Dessaure v. State</u>, 891 So. 2d 455, 464-65 (Fla. 2004) ("An order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial."). Here, Ortiz, Berrios, and Bullard—the three witnesses mentioned in the 1998 opening statements—testified during the 1997 trial that resulted in a mistrial. There is no evidence in the record demonstrating that the State referenced these witnesses in bad faith or with the intent to inflame the jury. <u>See</u> <u>Perez v. State</u>, 919 So. 2d 347, 363 (Fla. 2005). Rather, it appears that based on the 1997 trial, the State mentioned these witnesses during opening statements with the intent to present them during the 1998 retrial. Thus, the prosecutor's comments were consistent with the purpose of opening statements, and were not improper even though the State ultimately did not present these

_____

11. <u>Williams v. State</u>, 110 So. 2d 654 (Fla. 1959).

witnesses during trial.  See Occhicone v. State, 570 So. 2d 902, 904 (Fla. 1990) (Occhicone I) (noting that "Opening remarks are not evidence, and the purpose of opening argument is to outline what an attorney expects to be established by the evidence." (emphasis supplied)).  Further, although the State did not present these specific witnesses to establish that Lebron attempted to manufacture an alibi, the State presented similar testimony from other witnesses reflecting that Lebron had asked them to lie with regard to where he was located on the day of the murder.  Thus, Lebron had the opportunity to rebut the allegation that he was attempting to improperly influence witnesses to provide him with an alibi, although not through the specific witnesses mentioned by the State during its opening statement.

Since it is clear that the prosecutor's fleeting remarks during opening statements did not warrant a mistrial, we conclude that Lebron has failed to establish prejudice, as a reasonable probability does not exist sufficient to undermine confidence in his guilt that, but for the allegedly improper prosecutorial remarks made during opening statements, the result of the trial would have been different.  We deny relief on this claim.

**Failure to Properly Impeach State Witnesses**

Lebron contends that trial counsel performed ineffectively when he failed to adequately attack the credibility of several State witnesses.  He contends that had counsel possessed the transcripts, depositions, and records of prior convictions of

State witnesses during cross-examination, counsel could have attacked the credibility of these witnesses or pointed out inconsistencies between the witnesses' trial testimony and their previous statements and testimony.

Lebron's allegations do not warrant relief under Strickland because Lebron does not articulate with specificity the manner in which counsel's alleged failure to properly impeach several State witnesses demonstrates either deficiency or prejudice. See Spera, 971 So. 2d at 758. Although Lebron alleges that counsel "could have impeached the state's witnesses with transcripts," he does not sufficiently allege what information counsel could have used to impeach these witnesses or otherwise refuted their testimony. He also fails to articulate how counsel's failure to impeach State witnesses prejudicially impacted his trial to such an extent that confidence in his guilt has been undermined. As a result, this claim was insufficiently pled and was properly summarily denied by the postconviction court. See Johnston v. State, 70 So. 3d 472, 483 (Fla. 2011) (holding that the lower court did not err in issuing a summary denial of claims for which the defendant presented only bare, conclusory allegations).

**Failure to Move for a Mistrial—Williams Rule Evidence**

During Lebron's 1998 guilt phase trial, the prosecutor asked Mark Tocci if Lebron had ever bragged to him about crimes Lebron had committed in the past. Defense counsel immediately objected to the question as leading. That objection

was overruled by the trial court, and Tocci responded that Lebron only bragged to him about the theft of a car, for which he went to jail in Orange County. Defense counsel immediately and successfully moved to strike this comment. The prosecutor then asked a related question as to whether Tocci believed Lebron when Lebron would tell him about crimes that Lebron had purportedly committed. Tocci responded "no," and counsel did not object or move for a mistrial at that time.

Lebron contends that counsel's failure to object or move for a mistrial in response to this second statement constitutes deficient performance. He supports this claim by noting that later in the trial proceedings, defense counsel moved for a mistrial on this specific portion of Tocci's testimony, but the trial court denied that request because defense counsel did not object to either the prosecutor's second question or Tocci's answer. Lebron further contends that the erroneous admission of collateral crimes evidence is presumptively prejudicial because the admission of that testimony creates a danger that the jury may view the defendant's bad character or propensity to commit crimes as evidence of guilt of the crime charged.

Without addressing deficiency, we conclude that this claim fails the prejudice prong of Strickland. Tocci's one-word negative response to the prosecutor's second question conveyed that Tocci did not believe Lebron when Lebron would talk about criminal misconduct. This testimony does not constitute improper Williams rule evidence, and arguably benefitted Lebron's defense by

showing that Lebron was known among his friends to be a man of words, but not action. Further, considering the substantial evidence supporting Lebron's guilt, see Lebron I, 799 So. 2d at 1001-03, we conclude that but for counsel's failure to object to the prosecutor's second question and Tocci's one-word response, a reasonable probability sufficient to undermine our confidence in Lebron's guilt has not been presented nor would the outcome of Lebron's guilt phase trial have been different. Accordingly, we conclude that Tocci's one-word response to the prosecutor's second question was not prejudicial and is distinguishable from other cases that addressed the prejudicial impact of the erroneous introduction of Williams rule evidence. See, e.g., Jackson v. State, 451 So. 2d 458, 460-61 (Fla. 1984); Schofield v. State, 67 So. 3d 1066, 1071-72 (Fla. 2d DCA 2011); Jackson v. State, 627 So. 2d 70, 71 (Fla. 5th DCA 1993). We affirm the denial of this claim.

**Failure to Present Roswell Summers as a Witness During the 1998 Trial**

Lebron contends that Danny Summers' testimony during the 1998 trial was critical to the prosecution's case, and that trial counsel performed deficiently when he failed to: (1) present Roswell Summers, Danny's father, as a witness to impeach the credibility and testimony of Danny; (2) file a motion to establish the unavailability of Roswell during the 1998 retrial and introduce his former testimony from Lebron's first guilt phase trial; and (3) understand the procedures

necessary to properly impeach a State witness through the testimony of other witnesses. This claim fails for two reasons.

First, Lebron has failed to establish either deficiency or prejudice because he has failed to present any evidence that demonstrates Roswell was either willing or able to testify during Lebron's 1998 guilt phase trial. See Melton, 949 So. 2d at 1003; Nelson, 875 So. 2d at 583. Second, the claim fails because counsel's decision not to present Roswell was based on a sound trial strategy. During the original 1997 trial, Danny was presented by the State to describe his relationship with Lebron and the events on the day of the murder. The State next presented Roswell, who testified that Danny had initially lied to him about the location where he (Danny) had witnessed a murder. Roswell testified that Danny first told him that he had witnessed a murder at Church Street Station. Roswell then testified that Danny changed his story and told Roswell that he had actually witnessed a murder at a house.

During the 1998 retrial, Danny testified on direct examination that he did not immediately tell his parents about witnessing a murder. On cross-examination, trial counsel Slovis asked Danny whether he had initially told Roswell that something happened at Church Street Station. Danny responded, "I might have, but I don't remember." During the evidentiary hearing, counsel testified that Danny never concealed that he was deceptive and untruthful when he first told his

parents about the facts of the murder and counsel concluded that it would not have been a sound trial strategy to present Roswell as the only defense witness solely to rebut Danny's testimony. According to counsel, the defense did not want to sacrifice the procedural advantage of presenting the last closing statements simply to address a point that was essentially admitted to by Danny. Counsel's evidentiary hearing testimony suggests a carefully considered defense and provided a proper evidentiary basis for the postconviction court to deny relief. Consequently, we conclude that relief is not warranted on this claim.

**Failure to Object to the Hearsay Testimony of Detective Rodriguez**

During the 1998 trial, the State asked Detective Rodriguez whether Stacie Kirk had provided him with directions to find a shotgun that was believed to belong to Lebron. Detective Rodriguez answered in the affirmative and defense counsel immediately objected to this line of questioning. The objection was overruled by the trial court. Next, Detective Rodriguez began to describe Kirk's directions but defense counsel again objected to his testimony alleging it was hearsay. Without a ruling on the objection, the prosecutor rephrased his question and the detective testified that he followed Kirk's instructions but did not locate the shotgun. Shortly thereafter, during redirect examination, the State asked the detective whether it was possible the shotgun was still in New York, to which he responded, "as far as I'm concerned, it probably is." Defense counsel did not

object at that time to the State's question. Lebron contends counsel performed ineffectively when he failed to object to this question.

We affirm the postconviction court's denial of this claim. Lebron's counsel did not perform deficiently, as he objected to the prosecutor's line of questioning with respect to the location of the gun. Furthermore, because the trial court overruled counsel's general objection to the entire line of questioning, there is no reasonable probability that, had counsel objected to the more specific follow-up question asked by the prosecutor, that the trial court would have sustained the objection. Accordingly, this claim fails the prejudice prong of Strickland.

**Lebron's Penalty Phase Claims**

Lebron also challenges the postconviction court's denial of his eight penalty phase claims. Although Strickland serves as a baseline to assess both guilt and penalty phase ineffectiveness claims, this Court has developed a more detailed test for penalty phase challenges. One of our principal concerns in deciding whether counsel exercised reasonable professional judgment during a penalty phase proceeding is whether counsel should have presented a mitigation case. See Wiggins v. Smith, 539 U.S. 510, 522-23 (2003). We also focus on whether the investigation supporting counsel's decision to not introduce certain mitigating evidence was itself reasonable. Id. at 523. In assessing whether counsel's investigation was reasonable under prevailing professional norms, we conduct an

objective, context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time.  Id.  Furthermore,

> In the context of penalty phase errors of counsel, the prejudice prong of Strickland "is shown where, absent the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or the deficiencies substantially impair confidence in the outcome of the proceedings." Hoskins[v. State, 75 So. 3d 250, 254 (Fla. 2011)] (quoting Gaskin v. State, 737 So. 2d 509, 516 n.14 (Fla. 1999), receded from in part on other grounds by Nelson v. State, 875 So. 2d 579, 582-83 (Fla. 2004)).
> [A defendant] "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence.  To assess that probability, we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [evidentiary hearing]'—and 'reweig[h] it against the evidence in aggravation.' " Porter [v. McCollum, 558 U.S. 30, 41 (2009)] (quoting Williams [v. Taylor, 529 U.S. 362, 397-98 (2000))].  See also Wiggins, 539 U.S. at 534.  However, the Supreme Court reiterated in Porter that "[w]e do not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " Porter, [550 U.S. at 44] (quoting Strickland, 466 U.S. at 693-94).

Simmons v. State, 105 So. 3d 475, 503 (Fla. 2012) (parallel citations omitted).

### Failure to Conduct a Reasonable Investigation into
### Lebron's Background, Adverse Development, and Mental Health

Lebron contends that penalty phase counsel failed to adequately investigate and present substantial statutory and nonstatutory mitigating evidence.  According to Lebron, had counsel presented evidence with regard to his background, his adverse development, and his mental and psychological health, the mitigating circumstances would have outweighed the aggravating circumstances, and, given

the seven-to-five jury recommendation, the jury would have recommended a life sentence for the murder. To support these claims, Lebron presented Dr. Cunningham, a clinical forensic psychologist, and Dr. Eisenstein, a neuropsychologist and expert in the fields of clinical psychology, forensic psychology, and neuropsychology.

During the evidentiary hearing, Dr. Cunningham testified that he reviewed Lebron's background, education, and mental health records and interviewed Lebron and several of his friends and family members. Based on his evaluation, Dr. Cunningham identified thirty-two major adverse developmental factors in five different categories that he believed impacted Lebron during his childhood and teen years and could have been presented during the 2005 penalty phase. Dr. Cunningham also opined that Lebron's adverse developmental factors created substantial risk factors for delinquency and criminal violence. Dr. Eisenstein testified that Lebron suffers from a frontal lobe impairment that diminishes his ability to make rational life decisions, think logically, and show flexibility and control in decision making. Dr. Eisenstein also diagnosed Lebron with bipolar disorder, attention deficit hyperactive disorder (ADHD), borderline personality disorder, reactive attachment disorder, paranoid personality disorder, and intermittent explosive disorder (IED). He further concluded that Lebron suffers from functional brain impairment and cognitive brain dysfunction, and believed

that Lebron was suffering from an extreme mental and emotional disturbance at the time of the crimes.

To rebut the testimony of Dr. Cunningham and Dr. Eisenstein, the State presented Dr. Danziger, a psychiatrist and expert in forensic psychiatry, addictionology, and psychiatry. Dr. Danziger testified that Lebron suffers from antisocial personality disorder, polysubstance dependence, which was in remission, and multiple learning disabilities. However, Dr. Danziger did not believe that Lebron suffers from paranoid personality disorder because Lebron did not exhibit a sense of suspiciousness or believe that others were plotting against him. Dr. Danziger also could not identify anything from Lebron's background and records that would support a diagnosis of bipolar disorder. He testified that Lebron denied manic episodes, and that nothing in the sixteen years of prison records indicated that Lebron was actively suffering from mania, hypomania, or manic episodes.[12] Dr. Danziger also excluded reactive attachment disorder and IED. He explained that the clinical diagnosis of IED requires several discrete episodes that demonstrate an inability to resist aggressive impulses which are out of proportion to psychosocial stresses. Here, Dr. Danziger concluded that the facts of the murder

12. According to Dr. Danziger, a manic episode is characterized by a mood that is persistently elated or euphoric and is a necessary component to diagnose bipolar disorder. Hypomania involves at least four days of such symptoms, and mania involves seven days of symptoms.

and robbery demonstrate that Lebron's conduct during the crimes was calculated, planned, and organized rather than sudden and disproportionately aggressive. He also concluded that the evidence in support of the diagnosis of ADHD was equivocal, and that available evidence did not indicate Lebron was suffering from an extreme emotional or mental disturbance at the time of the murder. Finally, Dr. Danziger testified that he did not believe there was a direct correlation between Lebron's childhood and his ability to understand his actions on the day of the murder.

Penalty phase counsel testified with regard to his mitigation strategy for Lebron's fourth penalty phase. Counsel explained that he began his penalty phase investigation in the late 1990s and continued to refine his mitigation strategy with each subsequent penalty phase. During the investigation, he acquired Lebron's school records and personally visited the Pleasantville Cottage School to obtain detailed information about Lebron. Counsel testified that he spoke with nearly every person he thought might possess relevant mitigation information and followed an extensive mitigation checklist to ensure that his investigation was thorough. He directed his investigator to interview both Lebron and Lebron's mother, using the checklist as a guide to identify possible mitigation. Lebron did not provide counsel with the names of any friends or family members who could

have helped with the investigation, and, despite his independent investigative efforts, counsel was unable to locate Lebron's former stepfather, Tony Ortiz.

Counsel testified that he had originally retained Dr. Henry Dee to conduct a clinical interview as well as psychological and neuropsychological testing of Lebron. Dr. Dee concluded that Lebron exhibited signs of frontal lobe impairment. However, Dr. Dee also advised counsel that Lebron was "the coldest antisocial personality disorder [he had] ever seen." (Emphasis supplied.) Dr. Dee was astounded by Lebron's ability to emotionally react to situations while simultaneously maintaining the ability to make rational, calculated choices and address each situation in a way he felt appropriate. Lebron's counsel testified that he retained Dr. Dee in nearly every capital case in which he had participated, and that Dr. Dee's evaluation of Lebron "floored" him because he "never heard [Dr. Dee] describe anybody that way."

Based on Dr. Dee's evaluation of Lebron, counsel made a strategic decision not to present mental health mitigation because he did not want to expose Lebron to a compelled mental health examination.[13] Instead of presenting Dr. Dee, Dr.

13. In Dillbeck v. State, 643 So. 2d 1027, 1031 (Fla. 1994), we held that when a defense expert who has interviewed the defendant will be presented to testify during a capital penalty phase proceeding as to the presence of mental health mitigation, the State may hire its own mental health expert to examine the defendant, and that expert will be allowed to testify at trial to rebut the defense expert's testimony. Our holding has since been incorporated into Florida Rule of Criminal Procedure 3.202.

McClane was hired to only review the discovery and records, which allowed counsel to present mental health testimony about Lebron through his medical records without having to submit Lebron to a compelled mental health evaluation by a State expert.

Counsel did not present evidence of an extreme mental or emotional disturbance because Lebron continued to maintain that he was innocent and not present at the crime scene when the murder occurred. As a result, Dr. Dee could not develop an opinion of Lebron's mental state at the time of the crime, or whether Lebron's ability to conform his conduct to the requirements of law was substantially impaired. Even if Lebron had discussed his mental state at the time of the crime, Dr. Dee concluded that such evidence would have been outweighed by evidence demonstrating Lebron's unique ability to react to emotionally charged situations in a controlled, rational, and calculated manner. In light of his investigation into Lebron's background and mental health, counsel testified that the strategy during the 2005 penalty phase trial was to present only Lebron's mother to provide background information about Lebron's life, his relationship with her, his struggles in school, and his troubled childhood, and then to introduce mental health mitigation outside the presence of the jury through psychological records during the Spencer hearing.

**Analysis**

We have previously affirmed a trial court's finding that counsel's performance was not deficient where counsel conducted a reasonable investigation into mental health mitigation prior to trial and then made a strategic decision not to present that information. See Floyd v. State, 18 So. 3d 432, 453-54 (Fla. 2009); Jones v. State, 732 So. 2d 313, 317 (Fla. 1999); Rutherford v. State, 727 So. 2d 216, 223 (Fla. 1998). For example, in Floyd, the mental health expert concluded that the supposedly mitigating evidence would cause more harm than good in light of Floyd's antisocial personality disorder diagnosis, the fact that he killed his brother at age fourteen, and the inconsistencies between the statements of Floyd's parents. Id. at 454. We affirmed the postconviction court's finding that counsel properly relied upon the mental health expert and made a strategic decision not to present mental health mitigation during the penalty phase. Id.

Here, as in Floyd, we conclude that Lebron's counsel did not perform deficiently. His lawyer testified that he has tried over seventy murder cases and conduced approximately twenty-five penalty phase trials. He began his mitigation investigation in this case during the late 1990s, and with each penalty phase he continued to reconsider the evidence and refine his strategy. He reviewed family, school, and mental health records. He personally interviewed Lebron's mother and several individuals from the Pleasantville Cottage School to gain perspective on

Lebron's life and childhood. He retained Dr. Dee, a well-known and well-respected mental health expert, to evaluate Lebron. When Dr. Dee did not provide favorable mitigation information, counsel retained a second expert, Dr. McClane, to offer testimony about Lebron through his medical records so that Lebron would not be subjected to a compelled mental health evaluation.

Further, when Dr. Dee advised counsel that Lebron suffered from the most aggravated antisocial personality disorder he (Dr. Dee) had ever seen, counsel strategically decided not to present mental health mitigation for fear that the introduction of mental health mitigation would subject Lebron to a compulsory mental health evaluation by a State expert and would open the door to unfavorable testimony regarding the extent of Lebron's antisocial personality disorder. Counsel decided the best strategy was to mitigate the evidence offered, without presenting witnesses who he believed to be non-credible. See Lebron III, 982 So. 2d at 657. Counsel presented Lebron's mother, who testified about Lebron's family history and described his troubled childhood. These decisions were both reasonable and tactical and were reached after counsel evaluated the available evidence. Counsel ultimately decided—after having the unique opportunity to reconsider his penalty phase strategy three times—that Lebron's best chance of receiving a life sentence was if mental health mitigation was not presented to the jury. See Rutherford, 727 So. 2d at 223 ("Strategic decisions do not constitute

ineffective assistance if alternative courses of action have been considered and rejected." (quoting State v. Bolender, 503 So. 2d 1247, 1250 (Fla. 1987))). Simply because Lebron has now secured favorable mental health testimony does not render counsel's initial decision not to present mental health mitigation unreasonable. Floyd, 18 So. 3d at 454 ("Trial counsel's investigation into mental-health mitigation 'is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert.' " (quoting Asay v. State, 769 So. 2d 974, 986 (Fla. 2000))). Accordingly, we conclude counsel conducted a reasonable mitigation investigation into Lebron's background, mental health, and adverse development, and that counsel's decision not to present this mitigation was reasonable, strategic, and did not constitute deficient performance.

Lebron's claim also fails the prejudice prong of Strickland because he cannot establish that had the evidence offered during the evidentiary hearing been presented during his 2005 penalty phase trial, there is a reasonable probability he would have received a different sentence. See Simmons, 105 So. 3d at 503. Although Dr. Cunningham and Dr. Eisenstein could have presented relevant mitigating information about Lebron's background, mental health, and adverse development during the 2005 penalty phase proceeding, by introducing this testimony counsel would have opened the door to the introduction of damaging

testimony concerning the extent of Lebron's antisocial personality disorder. For example, a State expert could have testified that, as Dr. Dee conveyed to counsel, Lebron exhibited a remarkable antisocial ability to respond to emotionally charged situations in a calculating and rational way. A State expert also could have testified, as Dr. Danziger did, that Lebron exhibited several antisocial personality traits including: (1) a repeated pattern of criminal behavior; (2) deceitfulness, lying, and conning behavior; (3) irritability, aggressiveness, and repeated acts of violence; and (4) consistent irresponsibility between the ages of 18 and 21. Finally, a State expert could have testified, as Dr. Danziger did, that the facts of the robbery and murder suggested that Lebron planned and executed this crime through the use of organization and forethought.

Thus, had counsel introduced expert testimony about Lebron's mental health, he would have triggered the admission of highly unfavorable evidence in rebuttal that would have undercut the mitigation value of the testimony already presented during the penalty phase, particularly that Lebron was a product of a dysfunctional home and suffered a troubled childhood. See Reed v. State, 875 So. 2d 415, 437 (Fla. 2004) ("An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword."). Moreover, the evidence presented by Dr. Cunningham about Lebron's family background and his adverse development was largely cumulative to the

testimony and evidence presented during Lebron's 2005 penalty proceedings and addressed by this Court on appeal. See Lebron III, 982 So. 2d at 656, 661-64.

Based on the established aggravation (prior violent felony and the murder was committed during the commission of a robbery), the relative lack of mitigation (zero statutory mitigating circumstances and seven nonstatutory mitigating circumstances with none given more than "little weight"), the potential for admission of highly unfavorable mental health evidence in rebuttal, and the cumulative nature of some adverse development evidence, we conclude that trial counsel's failure to present evidence introduced by Lebron during the postconviction evidentiary hearing does not undermine our confidence in the outcome of Lebron's 2005 penalty phase proceeding. Consequently, Lebron has failed to establish ineffective assistance of counsel under either prong of Strickland and we affirm the postconviction court's denial of these claims.

### Alleged Failure to Conduct a Reasonable Investigation into Lebron's Substance Abuse During the Weeks and Months before the Murder

Lebron contends that counsel performed deficiently when he failed to conduct a reasonably comprehensive investigation into his substance abuse during the weeks and months before the homicide. Lebron claims that if counsel had conducted a reasonably competent investigation, he would have located additional witnesses who could have testified about Lebron's substance abuse.

During the evidentiary hearing, counsel testified that he inquired into Lebron's drug use, both around the time of the murder and throughout his life, but his investigation revealed that Lebron was not using drugs or alcohol (other than casual marijuana use) around the time of the murder. Lebron told counsel and the investigators that he was "an experimenter as opposed to an abuser," and that he would try drugs in social situations but would not continue to use them. Lebron denied heavy drinking, and Lebron's friends also indicated that Lebron was not a heavy drinker or drug user. Counsel was never informed, by Lebron or anyone else, that Lebron was habitually drinking a quart of vodka and using cocaine as Lebron claimed during the postconviction proceedings. Additional evidentiary hearing testimony from Dr. Danziger indicated that although Lebron self-reported the use of drugs and alcohol near the time of the murder, the facts of the crime did not suggest that Lebron was intoxicated or suffering from impaired mental faculties due to substance abuse. Rather, the facts indicated that Lebron possessed a relatively stable mental state and was executing a deliberate scheme to rob and murder the victim.

We conclude that counsel conducted a reasonable investigation into Lebron's drug and alcohol use. Counsel thoroughly investigated Lebron's use of drugs and alcohol and discovered that Lebron's drug use was casual and primarily limited to marijuana. Neither Lebron nor his friends described him as a drug or

alcohol abuser.  Thus, despite Lebron's current position that he was habitually abusing drugs and alcohol at the time of the crime, we conclude that counsel's investigation into Lebron's drug and alcohol use was reasonable and clearly within the wide range of professionally competent assistance.  Strickland, 466 U.S. at 690.

Lebron also fails the prejudice prong of Strickland because he cannot demonstrate that the introduction of evidence concerning Lebron's alleged drug and alcohol abuse would have created a reasonable probability that the jury would have recommended life.  The record reflects that even if Lebron was using drugs or alcohol or both during the months, weeks, days, or even hours before the crime, the drugs or alcohol had no identifiable impact on his ability to plan, organize, and execute the robbery and murder of the victim.  This claim does not undermine our confidence in Lebron's sentence of death and we affirm the postconviction court's denial of this claim, as it fails both elements required by Strickland.

**Failure to Present Evidence of Incomplete Brain Development**

According to Lebron, on May 25, 2004, the National Institutes of Health (NIH) published a study proving that the region of the human brain that inhibits risky behavior and volitional control is not fully formed and developed until an individual is approximately 25 years old.  Lebron contends that counsel, knowing that Lebron was 21 years old at the time of the crime, performed deficiently when he failed to present this study during the 2005 penalty phase trial.  Lebron alleges

that counsel's failure to present the study prejudiced him because the study proved that his emotional maturity was less than previously believed.

When a capital defendant is not a minor, no per se rule exists which pinpoints a particular age as an automatic factor in mitigation. Rather the existence and weight to be given to the age mitigating circumstance depends on the evidence presented during trial and the sentencing hearing. See Shellito v. State, 701 So. 2d 837, 843 (Fla. 1997); see also Nelson v. State, 850 So. 2d 514, 528-29 (Fla. 2003). For example, evidence that demonstrates a defendant's mental, emotional, or intellectual age was lower than his or her chronological age would support the finding of age as mitigation. Sims v. State, 681 So. 2d 1112, 1117 (Fla. 1996).

Without addressing deficiency, we conclude that Lebron has failed to establish prejudice because the introduction of the study would have had little or no effect on the jury's view of Lebron's age as a mitigating circumstance. We noted the following on appeal from Lebron's fourth penalty phase:

> During the 2005 penalty-phase proceeding, there was some evidence presented that Lebron functioned at a mental, emotional, and intellectual level below his chronological age, but conversely, there was also contradicting evidence that supported the opposite conclusion. A neuropsychological evaluation described Lebron as (1) "an extremely engaging youngster"; (2) highly motivated to perform well and attentive; (3) showing no evidence of disordered or delusional thought; (4) having an IQ of ninety-seven, which is in the "average range of intellective ability"; (5) exhibiting "no evidence of a dyslexia or dysgraphia for numbers or spatial disorganization of

numbers"; and (6) although slightly behind academically, having everything (e.g., brain functioning) needed to succeed. . . . Lebron lacks factors to link his chronological age to any immaturity. . . . Moreover, the record is virtually devoid of any evidence with regard to how Lebron functioned from the age of eighteen until Oliver's murder . . . . The manner in which Lebron functioned at the time of Oliver's murder would have been the most crucial evidence with regard to this age mitigator. The evidence is consistent with a finding that Lebron could function as a typical twenty-one-year-old.

Lebron III, 982 So. 2d at 660 (emphasis supplied). Thus, even if counsel introduced the NIH study during the penalty phase proceedings, the general findings in that study would have been significantly outweighed by the specific evidence introduced demonstrating that, at the time of the murder, Lebron was functioning as a typical 21-year-old adult. This conclusion is further supported by the fact that the 2005 penalty phase jury unanimously found that Lebron's age was not a mitigating factor. See Lebron III, 982 So. 2d at 657. We conclude that Lebron has failed to establish that a reasonable probability exists sufficient to undermine our confidence in his sentence of death that, but for the introduction of the NIH study, the outcome of the penalty proceedings would have been different. We affirm the postconviction court's denial of this claim.

**Failure to Present Positive Prisoner Evidence**

Lebron alleges that counsel was ineffective for failing to present evidence that Lebron would have adjusted positively to a life in prison.[14]  During the evidentiary hearing, counsel testified that he was aware of Lebron's behavior in prison, but decided not to present positive prisoner evidence because Lebron had been investigated for trying to escape from prison.  He testified that Lebron was never disciplined for the attempted escape, but knew that the State was aware of the allegation.  Counsel was also aware of another incident during which Lebron allegedly attempted to have a female smuggle a cell phone into prison for him; however, he could not remember if this incident occurred before or after the 2005 penalty phase.  Given the likelihood that the introduction of positive prisoner evidence would have opened the door to damaging evidence about Lebron's attempts to escape and smuggle contraband into prison, the strategic decision to not present this evidence during the penalty phase was reasonable and clearly within the wide range of professionally competent assistance.  Strickland, 466 U.S. at 690; see also Reed v. State, 875 So. 2d 415, 437 (Fla. 2004).  Accordingly, we affirm the postconviction court's denial of this claim.

---

14. Lebron lists several factors he believes, if presented, would have demonstrated that he could positively adjust to life in prison, including: (1) his age (31); (2) a ten-year history of no serious violence; (3) he was often housed in the general population with other non-death inmates; and (4) he earned his high school equivalency diploma in prison.

**Failure to Properly Contest the Prior Violent Felony Aggravator**

Finally, Lebron contends that his counsel was ineffective for failing to properly appeal Lebron's convictions for the robbery, assault, and kidnapping of Roger Nasser. In the Nasser case, Lebron initially was convicted of attempted first-degree murder, robbery with a firearm, and kidnapping, but these convictions were reversed on appeal because of juror misconduct. See Lebron I, 799 So. 2d at 1004 n.3; see also Lebron v. State, 724 So. 2d 1208 (Fla. 5th DCA 1998). Upon retrial, the jury returned special verdicts finding that Lebron had committed only assault with a firearm, robbery (without a firearm), and kidnapping with intent to commit a felony (without a firearm). Lebron I, 799 So. 2d at 1004 n.3. Lebron contends that, despite receiving numerous extensions of time, counsel failed to file a timely appellate brief in the Nasser case, and Lebron's challenges to his convictions for the lesser offenses were dismissed. According to Lebron, if counsel had properly appealed the Nasser convictions, there was a reasonable probability that the convictions would have been reversed. Lebron contends that counsel's failure to properly appeal the Nasser case permitted the Nasser convictions to improperly serve as a basis for the prior violent felony aggravator, and that he suffered prejudice because this aggravating factor was the primary aggravator in support of his sentence of death. The postconviction court denied

this claim, finding that Lebron failed to establish the prejudice prong of Strickland.[15]

This claim has a unique posture because it is premised on the allegation that counsel's ineffectiveness in a non-capital collateral postconviction proceeding constitutes ineffective assistance in this capital postconviction proceeding. During the evidentiary hearing, counsel testified that after Lebron was convicted of assault with a firearm, robbery, and kidnapping, he filed the initial notice of appeal with the district court. However, after fulfilling his obligations as trial counsel, the trial lawyer withdrew and the public defender was appointed to represent Lebron on appeal. Months later, Lebron's mother rehired previous counsel to represent

_____

15. The State contends that, pursuant to State v. Kilgore, 976 So. 2d 1066, 1069-70 (Fla. 2007), the postconviction court did not have jurisdiction to rule on this claim because registry counsel is expressly prohibited from representing a capital defendant in a postconviction proceeding other than the capital proceeding for which counsel was appointed. In Kilgore, this Court held that CCRC, like registry counsel, is not authorized to represent a capital defendant in a non-capital collateral postconviction proceeding attacking the validity of a felony conviction that was used as a prior violent felony aggravator in support of a sentence of death. Id. at 1070. The facts here are distinguishable from Kilgore. Lebron's current counsel, registry counsel Mills, did not represent Lebron in the Nasser appeal. Instead, Mills has presented a claim during Lebron's capital postconviction appeal that alleges Norgard's ineffectiveness during the Nasser case prejudicially impacted Lebron's fourth penalty phase trial. Thus, although Lebron's current capital postconviction claim is procedurally unique, registry counsel Mills is not representing Lebron in a collateral non-capital postconviction proceeding, and therefore is not acting outside of his statutory authority. As such, Kilgore is inapplicable to the facts at hand and the postconviction court had jurisdiction to rule on this claim.

Lebron on the Nasser appeal. By the time counsel received the record from the public defender's office, he only had approximately two weeks to complete the appellate brief. Counsel filed a motion for extension of time, and then left for a pre-planned family vacation. When he returned, he received a notice that the district court had dismissed the case. Counsel later unsuccessfully filed two separate motions, requesting that the district court reconsider its decision to dismiss the appeal. Counsel testified during cross-examination that he believed that even if he had timely filed the appeal, it would have been unsuccessful because there were no viable issues that would have justified the reversal of Lebron's convictions.

Lebron now alleges in his capital postconviction appeal that counsel's failure to file a timely appellate brief in the Nasser case constitutes ineffective assistance of counsel. This claim fails for two reasons. First, Lebron's capital postconviction appeal is a separate and independent action from the Nasser appeal. Simply because Lebron was represented by the same counsel during the Nasser appeal and his 2005 penalty phase does not mean that he can circumvent procedural rules to raise claims here that should have been raised in a habeas petition during the Nasser collateral postconviction proceeding. As a result, Lebron's claim alleging counsel's ineffectiveness during a non-capital collateral proceeding is procedurally barred and improperly raised in this capital appeal.

Second, Lebron's claim fails the prejudice prong of <u>Strickland</u>. Even if (1) counsel had timely filed an appeal in the Nasser case; and (2) the appeal was somehow successful, Lebron's current claim would still fail because Lebron was adjudicated guilty of <u>two other</u> violent crimes[16] that both <u>independently</u> support the imposition of the prior violent felony aggravating circumstance. <u>See</u> <u>Lebron III</u>, 982 So. 2d at 667 (noting that the trial court relied on <u>three</u> prior violent felonies in support of a finding that the aggravating factor was present). Thus, even if the Nasser case never existed, Lebron's prior criminal conduct would still support the finding of the same statutory aggravating circumstance. Accordingly, because Lebron's claim fails the prejudice prong of <u>Strickland</u>, we affirm the postconviction court's denial of this claim.

### Cumulative Error

Lebron's individual claims of ineffective assistance of counsel during both the guilt and penalty phases of his trial independently lack merit. Lebron is not entitled to relief on a cumulative error claim. <u>See</u> <u>Patrick v. State</u>, 104 So. 3d 1046, 1069 (Fla. 2012), <u>cert. denied</u>, 134 S. Ct. 85 (2013).

---

16. Those crimes were: (1) a 1993 attempted robbery in New York; and (2) the aggravated assault with a firearm involving victim Gribben that was committed a few days before Oliver's murder. <u>Lebron III</u>, 982 So. 2d at 667.

## Conclusion

In light of the foregoing, we affirm the postconviction court's denial of Lebron's motion for postconviction relief.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.


An Appeal from the Circuit Court in and for Osceola County,
    Belvin Perry, Jr., Judge - Case No. 1996 CF 002147 CR

J. Edwin Mills, Orlando, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, Florida,

    for Appellee